2012 UT 16

Eric STERN, Michaela Stern, Loraine Sundquist Berolatti, Lloyd J. Cummings, Lorraine Cummings, Leland Richins, Linda A. Richins, Anthony A. Costanza, DeVonna Costanza, Roger Chase, Becky Chase, L. Craig Hamada, Susan Hamada, Jeff Darby, and Kim Darby, Plaintiffs and Appellants,

v.

METROPOLITAN WATER DISTRICT OF SALT LAKE & SANDY, Draper City, and Draper Irrigation Company, Defendants and Appellees.

No. 20100339.

Supreme Court of Utah.

March 20, 2012.

Stephen K. Christiansen, Kelley M. Marsden, Salt Lake City, for appellants.

W. Cullen Battle, Rachel G. Terry, Rachel S. Anderson, Salt Lake City, for appellee Metropolitan Water District of Salt Lake & Sandy.

Douglas J. Ahlstrom, Benjamin C. Rasmussen, Draper, for appellee Draper City.

David B. Hartvigsen, Matthew E. Jensen, Salt Lake City, for appellee Draper Irrigation Company.

Justice LEE authored the opinion of the Court, in which Chief Justice DURHAM, Associate Chief Justice DURRANT, Justice PARRISH, and Justice NEHRING joined.

Justice LEE, opinion of the Court:

¶ 1 The Point of the Mountain Aqueduct is a sixty-inch diameter pipeline that runs along the historic Draper Canal and transports culinary water to Salt Lake City and other cities in the Salt Lake Valley. Plaintiffs in this case are homeowners who asserted claims challenging Metropolitan Water District's construction of the aqueduct as exceeding the scope of its real property rights along the canal route. The district court granted summary judgment for the Water District. We affirm that decision in most respects, but reverse and remand for further proceedings on one issue.

I

¶ 2 Appellants are four private property owners in Draper, Utah whose land abuts the Point of the Mountain Aqueduct. Metropolitan Water District of Salt Lake & Sandy is a water district organized under the Metropolitan Water District Act. *See* UTAH CODE §§ 17B–2a–601 to –608. The District constructed the aqueduct on real property it acquired through its codefendants, Draper City and Draper Irrigation Company.[1] The District placed the aqueduct along the Draper Canal, which was originally constructed sometime between 1915 and 1921 by the District's predecessor in interest, Utah Lake Irrigation Company (ULIC).

---

1. Both the City and Draper Irrigation joined the District's motion for summary judgment in the district court and joined the District's brief on appeal. Unless otherwise noted, we refer to the defendants collectively as "the District" or "the Water District."

¶ 3 In the following paragraphs, we (a) first recount ULIC's original acquisition of property rights for its construction of the Draper Canal; (b) then explain the canal's usage from 1921 through the 2005 construction of the Point of the Mountain Aqueduct; and (c) conclude with a discussion of the procedural history of this case.

### A

¶ 4 In 1914, ULIC sought to develop an irrigation canal on the southeast benches of the Salt Lake Valley and began obtaining the necessary property rights. At the time, appellants' predecessors in interest owned four parcels of land in the proposed path of the canal. ULIC used three different methods to obtain rights in these parcels: (1) voluntary transfers, (2) a stipulated condemnation judgment, and (3) a contested condemnation judgment. ULIC constructed the Draper Canal after successfully obtaining property rights in a fifty-foot strip of land traversing appellants' predecessors' parcels. The company identified the lengths of the canal corresponding to the boundaries of each parcel as "reaches." Reaches 16–19 are at issue in this case.

¶ 5 ULIC obtained Reaches 16 and 17 by warranty ·deed from Bayard and Matilda Crosgrove in 1914 (Crosgrove Deeds I and II, respectively). The relevant language in the Crosgrove Deeds is identical, stating that the grantors "hereby convey and warrant to Utah Lake Irrigation Company" a "described tract of land in Salt Lake County." Both Deeds further state that the "strip of land [is] to be used for canal purposes only." Appellants Anthony Costanza ˙and DeVonna Costanza are the Crosgroves' successors in interest as current owners of the property abutting Reach 16. Appellants Eric Stern, Michaela Stern, Leland Richins, and Linda Richins are also the Crosgroves' successors in interest as current owners of the property abutting Reach 17.

¶ 6 ULIC obtained Reach 18 through a stipulated Judgment in Condemnation against the Susannah Crane family, entered August 22, 1914 (the Crane Judgment).[2] Prior to the Judgment, the Cranes had agreed that "a decree of condemnation may be entered herein, condemning in fee to plaintiff the property hereinafter described for the purpose of constructing and maintaining a canal." Pursuant to this stipulation, the Judgment stated that the "action was commenced to condemn the property ... for the purpose of constructing and maintaining a canal," and ordered "that plaintiff take and acquire and have [the property] for its use in fee." Appellant Loraine Berolatti is the Cranes' successor in interest as current owner of the property abutting Reach 18.

¶ 7 ULIC obtained Reach 19 through a condemnation decree (the Smith Decree), entered July 21, 1915, after a jury trial against Elida H. Smith. The Smith Decree granted ULIC a "right of way for its canal and for the construction, operation and perpetual maintenance" of the canal. Appellants Lloyd Cummings ˙and Lorraine Cummings are Smith's successors in interest as owners of the property abutting Reach 19.

### B

¶ 8 In 1921, after acquiring the necessary property rights and building the Canal, ULIC transferred ownership of the canal to Draper Irrigation Company. Draper Irrigation used the canal for the next seventy years to transport irrigation water from the Jordan River to farmland in southeastern Salt Lake County.

¶ 9 Over the years, the canal began to receive increased flows of urban and storm water runoff, and in 1975, Draper Irrigation granted Salt Lake County the right to use the canal as part of its storm drain and flood control system. Then in 1998, Salt Lake County transferred control over the storm drain and flood control uses of the south portion of the canal (including Reaches 16–19) to Draper City, which continued using the canal for storm drainage.

¶ 10 Meanwhile, in 1993–94, Draper Irrigation installed underground irrigation-water

---

**2.** At the time (and still today), a water-rights statute authorized any person or corporation to use eminent domain to obtain a right of way for "conveying water for irrigation or for any necessary public use." *See* Utah Comp Laws § 3466 (1917).

pipelines across most of the canal, but not across Reaches 16–19, which remained open. Draper Irrigation ceased cleaning and maintaining the open portions of the Canal in 1993, and then ceased transporting open irrigation water sometime between 1993 and 1995.[3]

¶ 11 In 1998, Draper City began negotiating with Draper Irrigation to acquire the canal for use as a public trail and for storm drainage purposes. Draper Irrigation eventually conveyed its interest in the canal to Draper City in 2001.

¶ 12 Soon afterward, in 2002, Metropolitan Water District of Salt Lake & Sandy negotiated with Draper City to build the Point of the Mountain Aqueduct through the City. The proposed aqueduct would carry culinary water from the District's Point of the Mountain Water Treatment Plant to other treatment plants in the area. Following these negotiations, Draper City executed a "Non-Exclusive Pipeline Right of Way and Easement Agreement," granting the District use of the canal for its Aqueduct.

¶ 13 The Water District began construction in 2005, and during the course of this litigation it has completed the buried aqueduct and graded the surface of the old Draper Canal. In connection with laying the sixty-inch pipeline, the District constructed cement air-valve structures that rise a number of feet above ground,[4] and installed a fiber-optic control cable that operates the valves. According to appellants, "one of the concrete blocks is directly in front of the Sterns' front door." Draper City has also constructed a public bicycle path along the graded surface of the old Canal, traversing Reaches 16–18 abutting appellants' property.[5]

**C**

¶ 14 Appellants brought this action in the district court at the outset of the Water District's construction of the aqueduct. The court denied appellants' initial request for a preliminary injunction, and the parties cross-moved for summary judgment while the construction proceeded. In their summary judgment motion, appellants argued that:

(1) The Crosgrove Deeds, the Crane Judgment, and the Smith Decree conveyed easements solely for the purpose of an irrigation canal;

(2) The aqueduct exceeded the scope of these easements because it was for culinary use and because the air-valve structures burdened the servient estate beyond the contemplation of the original parties;[6]

(3) In the alternative, even if the Crosgrove Deeds and the Crane Judgment conveyed fee interests, the instruments contained restrictive covenants that run with the land, limiting use of the property to the original irrigation canal; and

(4) As an additional alternative, Draper Irrigation abandoned its easements when it ceased using Reaches 16–19 for open irrigation flows in 1995.

¶ 15 The District, joined by Draper City and Draper Irrigation, argued that the Crosgrove Deeds and the Crane Judgment conveyed fee interests and contained only personal covenants that did not run with the land. It conceded that the Smith Decree granted only an easement, but argued that

---

3. There is some dispute as to whether the irrigation flows ceased in 1993 or not until 1995. We consider the facts in the light most favorable to the appellant and assume that the irrigation flows ceased as early as 1993. *See Mountain W. Surgical Ctr., L.L.C. v. Hosp. Corp. of Utah*, 2007 UT 92, ¶ 10, 173 P.3d 1276 ("The court must view all facts and inferences in the light most favorable to the nonmoving party . . . .").

4. Appellants assert in their briefs on appeal that the concrete blocks are eight feet high, but in the district court they claimed only six feet. At oral argument, the Water District stated its belief that the blocks are a mere four feet.

5. The path traverses only the east side of Reach 19, and the Cummings have an interest only in property abutting the west side of the Reach.

6. They also asserted that the proposed bike bath is outside the scope of the original easements yet never squarely addressed this in any of their briefs before the district court. Moreover, the district court never mentioned the bike path in its memorandum decision. On appeal, Draper City has conceded that the bike path is outside the scope of its property interests that are limited to canal purposes only.

the scope of the easement was broad enough to include the buried, culinary-water pipeline and the air-valve structures. Finally, the District argued that it never intended to abandon the easement and continued using the easement for storm water purposes between 1993 and 2001.

¶ 16 The district court denied appellants' motion and granted summary judgment to the Water District. Concerning Reaches 16–17, the court concluded that the Crosgrove Grants "were standard warranty deeds that 'conveyed and warranted'" fee interests to ULIC, and that the deeds' "canal purposes only" language was merely a personal covenant that "does not bind successive owners."

¶ 17 Concerning Reach 18, the court concluded that the Crane Judgment conveyed a fee interest to ULIC because the judgment "specifically refers" to a conveyance "in fee." In addition, the underlying stipulation expressly authorized a condemnation "in fee." The court also interpreted the other language in the judgment "as being personal covenants" that do not run with the land.

¶ 18 With regard to Reach 19, the court concluded that the District's use "does not exceed the scope of the easement" because of the "need for modernization" and because the aqueduct did not impose an "excessive burden" on appellants. The court stated that "there is no legal or factual support for the plaintiffs' position that the easement … must be limited to irrigation purposes only."

¶ 19 Finally, the court concluded that appellants had not shown by clear and convincing evidence that the District had abandoned its Reach 19 easement. According to the court, "while irrigation flow may have ceased in 1995, the Canal has continuously been utilized for storm water drainage," refuting any claim of abandonment. Appellants appealed from the district court's summary judgment ruling. We elected to retain jurisdiction to resolve important issues concerning the interpretation of deeds and the relationship between private property rights and public water projects.

¶ 20 Whether the Water District was entitled to summary judgment is a question of law we review for correctness. Salt Lake City Corp. v. Big Ditch Irrigation Co., 2011 UT 33, ¶ 18, 258 P.3d 539. Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. UTAH R. CIV. P. 56(c).

¶ 21 The interpretation of a deed is generally a question of law we review for correctness. See Hartman v. Potter, 596 P.2d 653, 656 (Utah 1979).[7] We also review the district court's interpretation of the Crane Judgment and the Smith decree for correctness. See Park City Utah Corp. v. Ensign Co., 586 P.2d 446, 450 (Utah 1978) ("[A] judgment is subject to construction according to the rules that apply to all written instruments.").

II

¶ 22 We affirm in part, reverse in part, and remand for further proceedings on one question that was not appropriately resolved on summary judgment. First, as to Reach 18, we affirm the district court's ruling that the Crane Judgment conveyed a fee simple interest to ULIC, free of any restrictive covenants.

¶ 23 Second, as to Reaches 16–17, we affirm the district court's ruling that the Crosgrove Deeds conveyed fee interests to ULIC. We reverse, however, the district court's conclusion that the Crosgrove Deeds contain personal covenants, and hold instead that the Deeds impose restrictive covenants that run with the land, limiting the use of Reaches 16–17 to "canal purposes only." We further hold that transporting culinary water in the canal does not violate these restrictive covenants because we cannot construe "canal" to be limited to irrigation purposes. But we remand for a determination of whether the Water District's construction of the canal and its associated air-valve structures was reasonable and did not materially exceed the

---

7. Deed interpretation poses questions of fact only if extrinsic factual evidence is relevant and the deed remains ambiguous after applying all relevant tools of construction. See Hartman v. Potter, 596 P.2d 653, 656 (Utah 1979).

burden sought to be limited by the Crosgrove Deeds' restrictive covenants.

¶ 24 Finally, as to Reach 19, we affirm the district court's conclusion that transporting culinary water falls within the scope of "canal purposes" under the easement created by the Smith Decree. However, under the same standard we apply to Reaches 16–17, we reverse the district court's conclusion that, as a matter of law, the construction of the buried pipeline and its associated air-valve structures was reasonable and did not materially alter the burdens to the servient estate, and we remand for a factual determination of that issue. We also affirm the district court's ruling that the Water District was entitled to summary judgment regarding appellants' claim that Draper Irrigation abandoned its Reach 19 easement after 1993. Abandonment claims require clear and convincing evidence, and appellants produced insufficient evidence in the district court to allow any reasonable fact finder to conclude that Draper Irrigation intended to abandon its Reach 19 easement.

¶ 25 In Section A we address Reach 18, which presents the simplest interpretive issue. Section B then explains why ULIC obtained a fee rather than an easement in Reaches 16–17, and why its fee interest is restricted by covenants that run with the land. In Section C we address the meaning of "canal purposes," which defines the scope of both ULIC's Reach 19 easement and the restrictive covenants that burden Reaches 16–17. Finally, Section D concludes that Draper Irrigation never abandoned the Reach 19 easement.

### A. Reach 18: Fee Simple Absolute

■ ¶ 26 Entered in 1914, the Crane Judgment is a judgment and order of the Salt Lake County District Court. In that judgment, it is "ORDERED, ADJUDGED, and DECREED THAT PLAINTIFF take and acquire and have for its use in fee the said land hereinafter described." The judgment nowhere uses the words "easement" or "right of way," the terms typically used to convey a right to pass over another's land. *See Richard v. Pines Ranch, Inc.,* 559 P.2d 948, 949 (Utah 1977) ("A right of way means a right to pass over another's land...." (quoting 1 THOMPSON ON REAL PROPERTY § 464 (1924))). And as the district court concluded, no other language in the Crane Judgment in any way limits the grant to an easement.

¶ 27 Appellants nonetheless insist that "the only estate that could legally be conveyed" by the Crane Judgment was an easement. They point to the eminent domain statute in force at the time of the judgment, which authorized the taking only of a right of way.[8] Appellants also point to *Moon Lake Water Users Ass'n v. Hanson,* in which we held that a judgment pursuant to an analogous eminent domain statute conveyed only an easement, even though the judgment purported to convey title "in fee simple." 535 P.2d 1262, 1264 (Utah 1975).

■ ¶ 28 These arguments fail because—unlike the judgment in *Moon Lake*—the Crane Judgment was not contested. Prior to the judgment, the Cranes stipulated that "a decree of condemnation may be entered herein, condemning in fee to plaintiff the property hereafter described." Appellants have pointed to no rule that would prevent the Cranes from agreeing to convey the entire fee interest to ULIC for an agreed-upon price.[9] This distinguishes *Moon Lake*, in which the condemnor won a contested judgment against the condemnee. *See id.* at 1263. Had the Cranes not agreed to convey a fee interest, ULIC would have been limited to whatever statutory powers of condemnation it possessed. But given the Cranes' stipulation and the explicit grant of a fee in the judgment, the only reasonable conclusion

8. *See* UTAH COMP. LAWS § 3466 (1917) ("Any person, corporation, or association shall have a right of way across and upon ... private ... lands ... for the construction ... of all necessary canals....").

9. On the contrary, property owners are generally able to convey whatever interest they wish. *See* Redd v. W. Sav. & Loan Co., 646 P.2d 761, 763 (Utah 1982) ("[A]mong the rights attendant upon ownership and enjoyment of property are the rights to exchange, pledge, sell or otherwise dispose of it—rights which must be adequately protected." (internal quotation marks omitted)).

is that ULIC acquired a fee simple interest in Reach 18.

¶ 29 Moreover, that fee simple interest is not subject to a restrictive covenant limiting the use of Reach 18 to canal purposes. Though the introduction to the Crane Judgment states that the "action was commenced to condemn the property ... for the purpose of constructing and maintaining a canal," this prefatory statement of purpose in no way limits the operative terms of the judgment. These terms constitute an unambiguous order and decree that the Cranes "take and acquire" an unqualified "fee" interest in the land in question. These operative terms of the judgment contain no restriction or limitation to "canal purposes," and we see no basis for inferring such a restriction from the prefatory purpose statement. An action commenced for one particular purpose could certainly be resolved in a manner that extends beyond that purpose, and the Crane Judgment unambiguously does just that. We decline to read a preliminary statement of purpose as a limit on the operative terms of a judgment, and hold that the Crane Judgment imposed no restrictive covenant that would limit the property's use to canal purposes.

### B. Reaches 16–17: Fee Simple with Restrictive Covenants

¶ 30 The Water District's interest in Reaches 16–17 originates with the 1914 Cros-

grove Deeds.[10] Under appellants' interpretation of the deeds, they either conveyed only an easement to ULIC or conveyed a fee interest subject to restrictive covenants that limit the property's use to "canal purposes only." The Water District asks us to affirm the lower court's interpretation that the deeds conveyed fee interests and the "canal purposes" covenants were personal and did not run with the land. Examining the text, structure, and context of the Crosgrove Deeds, we conclude that (1) the Deeds conveyed a fee simple interest to ULIC and (2) the Deeds impose restrictive covenants that run with the land.

1

¶ 31 The District argues that the Crosgrove Deeds conveyed a fee to ULIC because they use the phrase "conveys and warrants," which is presumed by statute and common law to convey a fee interest. It also claims that, to rebut this presumption, appellants must present clear and convincing evidence to the contrary. The lower court agreed, stating that the plaintiffs had failed to produce clear and convincing evidence to rebut the presumption of a fee. Appellants argue that the heightened burden of proof was inappropriate, and that *Haynes v. Hunt,* 96 Utah 348, 85 P.2d 861 (1939), dictates a different result—that the "canal purposes" clause limits the estate conveyed to an easement.

---

10. The Crosgrove I Deed states:

### Warranty Deed

Bayard M. Crosgrove and wife Matilda Crosgrove Grantors, of Draper, in the county of Salt Lake state of Utah, hereby convey and warrant to Utah Lake Irrigation Company, a corporation grantee, of Provo City, Utah County, Utah, for the sum of Three Hundred Fifty and no/100 Dollars, the following described tract of land in Salt Lake County, State of Utah, to-wit:

[property description consisting of five lines of text].

The grantee agrees to construct and maintain one concrete bridge and two 1 foot galvanized iron flumes, across its canal for the use of the grantor.

Said strip of land to be used for canal purposes only.

The Grantors reserve the right to fence across the canal at the boundaries of the grantors land,

Provided, such fence shall be provided with suitable gates and shall not interfere with the operation and maintenance of said canal.

The Crosgrove II Deed states:

### Warranty Deed

Charles M. Crosgrove and his wife Elizabeth Crosgrove Grantors, of Draper, in the county of Salt Lake State of Utah, hereby convey and warrant to Utah Lake Irrigation Company, a corporation grantee, of Provo City, Utah County, Utah, for the sum of Three Hundred Fifty and no/100 Dollars, the following described tract of land in Salt Lake County, State of Utah, to-wit:

[property description consisting of eleven lines of text].

The grantee agrees to construct and maintain 2 concrete bridges and two, 1 foot galvanized iron flumes, across its canal for the use of the grantors.

Said strip of land to be used for canal purposes only.

¶ 32 We affirm the district court's conclusion that the Crosgrove Deeds conveyed fee interests to ULIC, but reject the clear and convincing evidence standard it applied. The district court invoked *Jacobson v. Jacobson*, 557 P.2d 156, 158 (Utah 1976), for the proposition that "conveyed and warranted" language in a deed creates a presumption that the deed transfers a fee simple interest, and that this presumption may be overcome only by "clear and convincing evidence." But *Jacobson* imposed that burden on plaintiffs who asked the court to reform a deed based on extrinsic evidence of the parties' alleged intent to execute a mortgage rather than transfer title. *Id.* at 157–58. The *Jacobson* court refused to ignore the deed's language and construe it as an equitable mortgage absent clear and convincing evidence that the deed did not mean what it said. *Id.*[11]

¶ 33 That is not the situation here. Appellants in this case do not ask us to *ignore* the Crosgrove Deeds' language and reform the Deeds based on extrinsic evidence of intent. Instead, they *rely* on the Deeds' language, arguing that the "canal purpose" clauses are meant to limit the conveyance to an easement. Thus, while we disagree with appellants' interpretation of the Deeds, the law does not require parties to show by clear and convincing evidence that their interpretation of a deed is correct, and the district court was wrong to require such a showing. Instead, courts interpreting a deed should employ all appropriate tools of construction to arrive at the best interpretation of its language.[12]

¶ 34 That said, the legislature has historically imposed a statutory presumption that "fee simple title is ... intended to pass by a conveyance of real estate, unless it appears from the conveyances that a lesser estate was intended." UTAH COMP. LAWS 1971 (1907); *see* UTAH CODE 57-1-3. This presumption is closely connected with the long-held rule that deeds are "construed most strongly against the grantor." *Wood v. Ashby*, 122 Utah 580, 253 P.2d 351, 353 (1952). With this in mind, we read the text and structure of the Crosgrove Deeds to convey fee interests.

¶ 35 The Deeds' granting clauses state that they "hereby convey and warrant" a described tract of land. "Convey and warrant" is prototypical language used for transferring a fee simple interest in real estate.[13] This is true at common law and under a Utah real-estate statute—in effect in 1914 and today—which provides an example of a warranty deed using the language "hereby conveys and warrants" and further provides that a "warranty deed ... shall have the effect of a conveyance in fee simple to the grantee." UTAH COMP. LAWS 1981 (1907); *see also* UTAH CODE 57-1-12(1), (2).

¶ 36 The Deeds' use of prototypical language for conveying a fee simple, the statutory mandate to presume a fee conveyance, and the absence of any contrary "right of way" language strongly evince a conveyance of a fee simple interest. Nevertheless, appellants argue that the Deeds should be read as conveying mere easements because both contain a clause that states, "Said strip of land [is] to be used for canal purposes only." This argument fails, however, in light of the structure of the Deeds and the placement of the "canal purposes" clauses.

¶ 37 The granting language appears near the beginning of the Crosgrove Deeds, fol-

---

**11.** *See also, e.g., Hatch v. Bastian*, 567 P.2d 1100, 1102 (Utah 1977) ("[W]hen a Warranty Deed is duly executed, without any reservations therein, it conveys all of the rights and interests the grantor has in the property. In order to circumvent that result by reforming the deed [the plaintiff] ha[s] the burden of proving by clear and convincing evidence that there was a mutual mistake of fact." (footnote omitted)).

**12.** *See RHN Corp. v. Veibell*, 2004 UT 60, ¶¶ 40–41, 96 P.3d 935 (explaining that rules of construction are used to interpret a deed's language, while deed reformation is based on extrinsic evidence); *Williams v. Oldroyd*, 581 P.2d 561, 563 (Utah 1978) (distinguishing between "[a]pplying rules of construction" and using extrinsic evidence for "reformation of a deed").

**13.** *See Haynes v. Hunt*, 96 Utah 348, 85 P.2d 861, 864 (1939) ("The language ... 'hereby convey and warrant' normally implies a grant of the fee...."). In contrast, "the words 'right of way' are generally held to denote an easement or servitude rather than an interest in fee simple." *Chournos v. D'Agnillo*, 642 P.2d 710, 712 (Utah 1982).

lowed by a description of the property, and then by a list of specific agreements governing the use of the property. The canal clause is not part of the granting language or the description of the property. Instead, it appears in the final section, where the Deeds contain additional covenants between the parties. Immediately above the purpose clause, for example, Deed I imposes an affirmative covenant, stating that the "grantee agrees to construct and maintain one concrete bridge and two 1 foot galvanized iron flumes, across its canal for the use of the grantor." Deed II contains a similar covenant. The purpose clause's placement—in proximity to this covenant, and not in conjunction with the granting language—is significant. If the parties had meant to restrict the conveyance to an easement, they presumably would have placed the purpose provision in a separate habendum clause.[14] Instead, the parties placed the purpose clause next to and beneath an affirmative covenant. In light of this placement, we read the purpose clause to impose a covenant, not to limit the conveyance to an easement.

¶ 38 Appellants insist that *Haynes v. Hunt*, 96 Utah 348, 85 P.2d 861 (1939), requires a different result. It does not. *Haynes* construed a deed to convey only an easement because it contained a clause in the property description that limited the "property's use to propagation of fish." *Id.* at 862. That holding, however, hinged on the placement and evident function of the "propagation of fish" clause: "The description of the property for grant of a fee is complete without this clause, and unless the clause is used to limit or qualify the grant it can serve no purpose whatsoever." *Id.* at 864. *Haynes* does not help appellants here for two reasons. First, the purpose clauses in the Crosgrove Deeds are not in the property description; they are included with other covenants. Second, unlike the *Haynes* court, here it cannot be said that the purpose clauses "serve no purpose" unless they limit or qualify the grant. The Crosgrove Deeds purpose clauses impose covenants on the grantee. In our view, the purpose clauses

are not superfluous and their placement makes perfect sense if interpreted as covenants rather than limits on the granting language. We therefore affirm that the Deeds conveyed a fee interest to ULIC.

### 2

¶ 39 Appellants further contend that even if the Crosgrove Deeds conveyed fee simple interests to ULIC, the Deeds contain covenants that run with the land, limiting the Water District's use of Reaches 16–17 to "canal purposes only." The district court concluded that the "canal" clauses "must be construed as a personal covenant between grantor and grantee, which would not affect or otherwise limit the title and which does not bind successive owners." The Water District asks us to uphold the lower court's conclusion, arguing that the deeds contain no express language indicating that they were intended to bind successive owners. We disagree with the Water District and with the district court, and hold that the Crosgrove Deeds' "canal purposes only" covenants run with the land.

#### a

¶ 40 A covenant that "runs with the land" binds successive owners of the burdened or benefited land. *See Flying Diamond Oil Corp. v. Newton Sheep Co.*, 776 P.2d 618, 623 (Utah 1989). The rights and duties of a personal covenant, by contrast, terminate when a covenanting party conveys the property to a subsequent owner. *Id.* A successor-owner claiming the benefit of a predecessor-owner's covenant must demonstrate that the covenant meets three requirements: (1) the covenant must touch and concern the land affected by the covenant, (2) the original parties to the covenant must have expressly or impliedly intended the covenant to run with the land, (3) there must be privity of estate, and (4) the covenant "must be in writing." *Id.* at 622–23, 629; *see also* RICHARD R. POWELL, POWELL ON REAL PROPERTY § 60.04(2), at 60–40 (Michael Allan Wolf ed., 2011) (listing the elements as "touch and

---

14. A habendum clause is "[t]he part of an instrument, such as a deed or will, that defines the extent of the interest being granted and any

conditions affecting the grant. The introductory words to the clause are ordinarily *to have and to hold.*" BLACK'S LAW DICTIONARY 778 (9th ed. 2009).

concern," "inten[t]," and "some form of privity").[15]

¶ 41 There is no dispute that the covenant touches and concerns the land, that the covenant is in writing, or that the District and appellants are in privity with ULIC and the Crosgroves, respectively.[16] The Water District takes issue only with the intent requirement. It argues that appellants must prove by clear and convincing evidence that the original parties intended the covenant to run with the land, and that appellants have not met this burden because the Deeds contain no express language of intent.

¶ 42 The law unquestionably requires a party seeking to enforce a real covenant to show that the original parties to the covenant intended that the covenant run with the land. *Flying Diamond*, 776 P.2d at 623. Despite the Water District's argument to the contrary, however, our law does not require parties to prove such intent by clear and convincing evidence. *See id.* The Water District cites to New York law, which indeed has adopted the clear and convincing standard for demonstrating that covenants run with the land. *See Smith v. Estate of LaTray*, 161 A.D.2d 1178, 1179, 555 N.Y.S.2d 968 (N.Y.App.Div.1990). The rule in New York is ultimately based on the policy of favoring "the free and unobstructed use of realty." *Huggins v. Castle Estates, Inc.*, 36 N.Y.2d 427, 369 N.Y.S.2d 80, 330 N.E.2d 48, 51 (1975). We acknowledge the place of this policy under Utah law,[17] but decline to depart from the standard we used in *Flying Diamond*, 776 P.2d at 622–23. A party seeking to enforce a real covenant in Utah thus bears the burden of establishing intent by a mere preponderance of the evidence.

¶ 43 To meet this burden, an express statement in a deed or testimony from the original covenantors that a covenant is intended to run (or not to run) with the land is normally sufficient. *Id.* at 627. But often, as in this case, the deed says nothing either way, and the original parties are long gone. The court is then left to infer the parties' intent in the face of silence. In these circumstances, the parties' intent that the covenant run with the land may be "implied by the nature of the covenant itself." *Id.*[18]

¶ 44 In many cases, courts assume that parties intend a covenant to run with the land if the covenant touches and concerns the land in a manner that inherently benefits present and future owners' of the benefited land.[19] This approach reflects the interrela-

---

15. To the extent this is an action for injunctive relief, the appellants seek to enforce an equitable servitude, not a restrictive covenant at law. *See Flying Diamond*, 776 P.2d at 623 nn. 5–6. Although the parties fail to acknowledge this distinction, it makes no difference in this case because the intent requirement—the sole disputed issue—is the same under both equitable servitudes and real covenants. *See id.* ("For a covenant to run in equity, it must 'touch and concern' the land, and there must be an intent that it run. Privity is not required, but the successor must have notice of the covenant."); *see also* 9 POWELL, *supra* note 15, § 60.04(2), at 60–40 ("Different requirements developed for running of real covenants at law and running of equitable servitudes.").

16. Anthony and DeVonna Costanza are the current owners of the property abutting Reach 16. Eric and Michaela Stern and Leland and Linda Richins are the current owners of the property abutting Reach 17. The Costanza, Stern, and Richins deeds all originated from the Crosgrove family.

17. *See, e.g., Boyle v. Baggs*, 10 Utah 2d 203, 350 P.2d 622, 625 (1960) ("[I]t is also the policy of the law, insofar as consistent with principles of justice and equity, to keep land titles clear and to encourage alienability of property rather than the contrary.").

18. *See also* RESTATEMENT (THIRD) OF PROPERTY: SERVITUDES § 2.2 (2000) ("The intent to create a servitude may be express or implied. No particular form of expression is required.").

19. *See, e.g., Pedro v. Humboldt Cnty.*, 217 Cal. 493, 19 P.2d 776, 777 (1933) (pointing to the "nature and subject-matter of the agreement"); *Stinchcomb v. Clayton Cnty. Water Auth.*, 177 Ga.App. 558, 340 S.E.2d 217, 220 (1986) ("[B]y the very nature of the agreement the covenant is of necessity not merely personal or collateral, but is such as runs with the land."); *Moseley v. Bishop*, 470 N.E.2d 773, 777 (Ind.Ct.App.1984) (implying intent for a covenant that required grantee to "maintain a drain" because of the importance of this drain to the grantor's land); *Rogers v. Watson*, 156 Vt. 483, 594 A.2d 409, 412 (1991) (implying intent for a covenant that prohibited use of the land for a mobile home because the covenant was "intimately connected" with the land (internal quotation marks omitted)); *Albright v. Fish*, 136 Vt. 387, 394 A.2d 1117, 1120 (1978) ("Some promises are so inti-

tionship between the touch and concern and the intent requirements. *Id.* at 623.[20] In essence, the touch and concern element is a proxy for the parties' intent when other evidence of intent is lacking.[21] This is because touch and concern is an objective test that courts are capable of analyzing without reference to the subjective mindset of original covenantors who are frequently not before the court.[22] The result is that "[i]n most cases, where the parties have not stated an express intent, covenants that touch and concern have been assumed to be intended to run." [23]

¶ 45 For a covenant to touch and concern the land, the burdens and benefits it creates must directly relate to the land itself. *Flying Diamond,* 776 P.2d at 624. Running covenants must "be of such character that [their] performance or nonperformance will so affect the use, value, or enjoyment of the land itself that it must be regarded as an integral part of the property." *Id.* (internal quotation marks omitted). And as we have explained, covenants that are an integral and permanent part of the property—that is,

those that touch and concern the land—are presumed to be intended to bind successive owners because such covenants are more closely connected to the land than to any one owner.

¶ 46 This is typically the case with covenants involving structures such as ditches, sewer lines, and canals.[24] For example, in *Moseley v. Bishop,* the court construed a covenant that required a grantee to "permanently maintain" a drain that ran across the grantor's land. 470 N.E.2d 773, 776 (Ind.Ct. App.1984). The court held that the grantee's intent that the covenant run was implied from "the importance of the drain" to the land retained by the grantee:

> Given the importance of this drain to Moseleys land, it is improbable that the parties intended their agreement to be purely personal and not binding on subsequent grantees of the land. Faced with similar agreements relating to ditches and drains, courts in other jurisdictions have generally found an intent that the covenant run with the land.

mately connected with the land as to require the conclusion that the necessary intention for the running of the benefit is present absent language clearly negating that intent.").

**20.** *See* Lawrence Berger, *A Policy Analysis of Promises Respecting the Use of Land,* 55 Minn. L. Rev. 167, 219–20 (1970) ("[I]ntention and touch and concern have a very close relationship to each other. The intention requirement relates to the actual state of mind of the original parties to the transaction.... The touch and concern requirement, on the other hand, pertains to what the normal expectations of society would be as to whether this particular benefit or burden so relates to the owner in his capacity as owner that the average person would assume that the law would decree that such benefit or burden would accompany the ownership.").

**21.** *See* Margot Rau, Note, *Covenants Running with the Land: Viable Doctrine or Common–Law Relic?,* 7 Hofstra L.Rev. 139, 155 (1978) ("[C]ourts have combined [the touch and concern and intent] requirements, usually when they have had difficulty ascertaining the intention of the parties."). While Rau asserts that this is a misuse of the rules, *id.,* we think it is a rational method of ascertaining the likely intentions of the parties in the absence of any express statement regarding whether the covenant is meant to run.

**22.** 9 Powell, *supra* note 15, § 60.04(3)(a), at 60–42 ("The touch and concern requirement is the only ... requirement ... which focuses on an objective analysis of the contents of the covenant itself rather than the intentions of and relationships between the parties.").

**23.** William B. Stoebuck, *Running Covenants: An Analytical Primer,* 52 Wash. L. Rev. 861, 875 (1977); *see also, e.g., Greenspan v. Rehberg,* 56 Mich.App. 310, 224 N.W.2d 67, 73 (1974) (intent implied in a covenant to maintain a right-of-way, even though an adjoining covenant in the deed was deemed personal); *Soundview Woods, Inc. v. Town of Mamaroneck,* 14 Misc.2d 866, 872–73, 178 N.Y.S.2d 800 (N.Y.Sup.Ct.1958) (intent implied for covenant to run a water line), *aff'd,* 9 A.D.2d 789, 193 N.Y.S.2d 1021 (N.Y.App.Div. 1959); *Peto v. Korach,* 17 Ohio App.2d 20, 244 N.E.2d 502, 505–06 (1969) (intent implied for a covenant to maintain a sewer line).

**24.** *See* 20 Am.Jur.2d *Covenants, Conditions, and Restrictions* § 34 (2005) ("Covenants which pertain to waters and ditches generally run with the land."); *see also, e.g., Murphy v. Kerr,* 5 F.2d 908, 911 (8th Cir.1925) (intent implied in covenant to pump water); *Pizzolato v. Cataldo,* 202 La. 675, 12 So.2d 677, 680 (1943) (intent implied not only because ditch was to benefit the owners, but because it benefited the land itself).

*Id.* (also noting the covenant's use of the term "permanently").

¶ 47 Similarly, in *Pedro v. Humboldt County,* the court held that the parties impliedly intended that a covenant to keep and maintain a ditch ran with the land. 217 Cal. 493, 19 P.2d 776, 777 (1933). As the court explained:

> The nature and subject-matter of the agreement are themselves conclusive that the fulfillment of the agreement was not intended to benefit the covenantee only, but that it was intended also to benefit the land retained by the covenantee at the time she deeded the forty-foot strip to the defendants, and therefore to benefit the person or persons who may succeed to the ownership of the land and to the agreement made for the benefit thereof.
>
> *Id.*

¶ 48 *Moseley* and *Pedro* stand for the principle that covenants related to ditches, drains, and other water channels often so integrally touch and concern the land that they are likely intended to run with the land, at least where the grantor retains land adjacent to the granted property. And that principle directly applies to the facts of this case.

### b

¶ 49 Because the limitation in the Crosgrove Deeds that the property be "used for canal purposes only" integrally touches and concerns the land, we can properly infer that it was intended to run with the land. The covenant is a physical use restriction on Reaches 16–17, which significantly affects the use and value of the adjacent parcels retained by the Crosgroves. That the covenant is a restriction on use alone suggests that the covenant touches and concerns the land; if the original covenantor had been allowed to build other structures on the land, it may well have significantly devalued the adjacent land reserved by the original covenantees, the Crosgroves. Such action also could have restricted the Crosgroves' access to their own land. Thus, the use restriction not only

burdened the land conveyed to ULIC, but benefited the Crosgroves' land from possible encumbrances or unsightly developments.

¶ 50 The surrounding covenants in the deed also support the conclusion that the canal covenant was intended to run with the land. ULIC covenanted to construct bridges and iron flumes across the canal so that the Crosgroves could continue to access their adjoining parcel. The Crosgroves also reserved the right to construct fences across the canal to maintain a boundary to their land. These surrounding covenants, when read together with the canal restriction, show that the canal was thought to have a long-term effect on the boundary to the Crosgroves' land.

¶ 51 Because the "canal use only" restriction was integral to the burdened land and closely tied to the Crosgroves' use of their retained land, it is unlikely that the Crosgroves and ULIC would have intended the covenant to be merely personal. And because the Crosgroves continued to occupy their property abutting Reaches 16–17, we cannot conclude that they would have intended to allow ULIC to terminate these covenants unilaterally by merely transferring ownership. We therefore hold that the Crosgrove Deeds contained restrictive covenants that run with the land. These covenants limit the Water District's use of Reaches 16–17 to "canal purposes only."

### C. Reaches 16, 17 & 19: "Canal Purposes Only"

¶ 52 The existence of restrictive covenants in the Crosgrove Deeds requires us to construe those covenants—to define the scope of the "canal purposes" to which Reaches 16 and 17 are limited. And because the District's Reach 19 easement extends only to its "canal," our construction of the scope of "canal purposes" also delineates the scope of the District's rights in Reach 19.[25]

¶ 53 In evaluating the scope of the Water District's "canal" rights, we are faced with

---

**25.** Neither party suggests any difference between the "canal purposes" set forth in the covenant in Reaches 16–17 and the "canal" right described in the Smith Decree for Reach 19. Our construction of the scope of the Water District's "canal" rights thus applies not only to Reaches 16–17 but also to Reach 19.

the questions (1) whether "canal" is broad enough to include culinary water, (2) whether "canal" is limited to an open water channel or could refer to an enclosed pipeline, and (3) if so, whether the District's enclosure of the canal is a reasonable technological improvement to its property. Appellants insist that "canals" are waterways intended for irrigation purposes, not culinary water purposes. Appellants also suggest that "canal" necessarily implies an open waterway. Alternatively, appellants argue that even if "canal" could be construed to include a culinary water pipeline, the District's above-ground air-valve structures, which are visible from appellants' homes, materially increase the burden on their land such that the aqueduct is not a reasonable technological improvement to the property. The Water District, on the other hand, insists that "canal" encompasses not just irrigation water, but also culinary water; and that "canal" might plausibly refer not just to an open waterway, but to an enclosed pipeline; and that its transformation of the open canal into an underground pipeline—with its associated air-valve structures and fiber-optic control cable—is a reasonable technological improvement that does not exceed the scope of "canal" as used in the governing instruments.

¶ 54 The district court adopted the Water District's position. It concluded that "there is no legal or factual support for the plaintiffs' position that the easement ... must be limited to irrigation purposes only." And as for the pipeline enclosure, the court held that the District's use "is reasonable, given the need for modernization, and does not pose an excessive burden." In support of this conclusion, the district court cited *Valcarce v. Fitzgerald*, 961 P.2d 305, 313 (Utah 1998), and *Big Cottonwood Tanner Ditch Co. v. Moyle*, 109 Utah 213, 174 P.2d 148, 161 (1946), which, the court concluded, permit "reasonable modification and improvement of canals, including enclosure."[26]

26. The district court applied this reasoning only to Reach 19 because it had concluded that the Crosgrove Deeds imposed merely personal covenants that did not run with the land. Because we hold that the Crosgrove Deeds' covenants run with the land, the meaning of "canal" must be determined for all three Reaches. We assume that "canal" has the same meaning in the Cros-

¶ 55 We first address whether a "canal," as the term is used in the Crosgrove Deeds (Reaches 16–17) and the Smith Decree (Reach 19), may be used to transport culinary water or must be limited to irrigation water. For reasons that follow, we affirm the district court's conclusion that "canal" in this context is not limited to irrigation purposes. We then address whether "canal" could encompass a buried pipeline or is instead limited to an open water channel. On this issue, we conclude that "canal" may encompass a closed pipeline. Finally, we reverse the district court's conclusion that the District's particular enclosure in this case was reasonable and not unduly burdensome and remand for further proceedings on that issue.

1

¶ 56 In determining the meaning of "canal purposes only," the interpretive question before us is what the Crosgroves and the court entering the Smith Decree meant when they used the word "canal." Neither the Deeds nor the Decree explicitly refer to irrigation purposes. Nor do they make explicit reference to culinary purposes. The question, then, is whether the word "canal" itself conveys a limitation to a particular purpose—irrigation or culinary—or instead encompasses any or all water uses.

¶ 57 Although appellants cite a dictionary definition of "canal" that explicitly refers to irrigation purposes,[27] they do not seriously contend that "canal" necessarily excludes culinary purposes. Instead, they argue that the court "may look to the subsequent behavior of the parties to clarify" any uncertainty. According to appellants, the parties' use of "canal" must be limited to irrigation purposes because ULIC and Draper Irrigation used the canal from 1921 to 1993 solely for irrigation purposes.

grove Deeds and the Smith Decree because those instruments contain no contrary indication.

27. *See* Webster's New Int'l Dictionary 388 (2d ed. 1937) ("An artificial channel filled with water, designed for navigation, for irrigating land, etc.; as, the Erie *Canal.*").

¶ 58 For its part, the Water District points to other dictionary definitions that do not limit "canal" to irrigation purposes.[28] It further argues that the Deeds and Smith Decree "should be construed in light of the conditions in place at the time the [property interest] was created." We agree with the District. Looking to the uses of canals throughout Utah's early history, we interpret "canal" in this context to include transportation of culinary water.

¶ 59 Turning first to dictionaries, we note that most every dictionary definition of canal is broad enough to include culinary water.[29] That is a significant strike in the District's favor. Where the parties to a deed used broad language that admits of no qualification, courts should honor that choice and hold them to it.

¶ 60 In the absence of strong dictionary support for their position, appellants point to the parties' subsequent behavior for clarification. That behavior bears some relevance to our interpretation. The meaning of a word must be determined by looking to the context and circumstances in which it is used (whether in a contract, a deed, or in a court judgment[30]). However, while subsequent behavior is part of the context of a writing and can thus inform its meaning,[31] we do not know the specific reason that Draper Irrigation transported only irrigation water. It could have been because Draper Irrigation thought the term "canal" limited its property rights to irrigation water; but it could have been for some other reason—say, because it was in the irrigation business, not the culinary-water business. Thus, more than subsequent behavior is necessary in this case to resolve the interpretive issue.

¶ 61 Aside from dictionary definitions and subsequent use by the parties, common uses of canals in the early 1900s (the period in which the Deeds and Decree were executed) informs the meaning that the Crosgroves and the *Smith* court would have given to "canal." And though irrigation was a major driving force behind Utah's extensive canal system, the state's water history leaves us with no doubt that the historical understanding of canal uses would have extended to culinary purposes. This is evident in city ordinances, in documents describing canal projects, and in judicial decisions discussing early twentieth-century canals in Utah.

¶ 62 In the latter half of the nineteenth century, many city ordinances referred to nonirrigation, domestic uses of canals. At that time, the practice of many Utah cities was to appoint a water-master to supervise

28. *See* WEBSTER'S THIRD NEW INT'L DICTIONARY 324 (1961) ("channel, watercourse").

29. *See* WEBSTER, AN AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE 30 (1st ed. 1828) ("A passage for water; a water course; properly, a long trench or excavation in the earth for conducting water, and confining it to narrow limits; but the term may be applied to other water courses."); ROBERT GORDON LATHAM, A DICTIONARY OF THE ENGLISH LANGUAGE 347 (1882) ("Conduit or narrow passage for the transit of any fluid; artificial channel filled with water for the purpose of inland navigation."); NOAH WEBSTER & CHARLES MORRIS, UNIVERSAL HOME AND SCHOOL DICTIONARY OF THE ENGLISH LANGUAGE 78 (1916) ("an artificial watercourse; a pipe"); 2 OXFORD ENGLISH DICTIONARY 59 (1933) ("A pipe used for conveying water or liquid; also a tube, or tubular cavity. *Obs* .... An artificial water course constructed to unite rivers, lakes, seas, and serve the purposes of inland navigation."); WEBSTER'S NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE, UNABRIDGED 388 (2d ed. 1958) ("1. A pipe or tube, as for conveying liquids. *Obs*. 2. Any watercourse or channel; specif., a strait; also, a long and narrow orna-

mental pond. *Obs*. 3. An artificial channel filled with water, designed for navigation, for irrigating land, etc.; as, the Erie Canal.").

30. *See Park City Utah Corp. v. Ensign Co.*, 586 P.2d 446, 450 (Utah 1978) (explaining that a written "judgment is subject to construction according to the rules that apply to all written instruments"); *see also Swenson v. Erickson*, 2000 UT 16, ¶ 11, 998 P.2d 807 ("Restrictive covenants that run with the land and encumber subdivision lots form a contract between subdivision property owners as a whole and individual lot owners; therefore, interpretation of the covenants is governed by the same rules of construction as those used to interpret contracts."); *Pugh v. Stockdale & Co.*, 570 P.2d 1027, 1029 (Utah 1977) (noting that courts interpret words in a contract according to their "ordinary and usual" meanings).

31. *See* 4 POWELL, *supra* note 15, § 34.12, at 34–136 ("When a conveyance is unclear as to the scope of the intended easement, the subsequent behavior of the parties can constitute a practical construction furnishing the missing details.").

the cities' canals.[32] City ordinances in Salt Lake City, Logan, and Provo all defined the water-master's duties to include dividing canal waters "as shall best serve the public interest for irrigation, domestic and other purposes."[33]

¶ 63 Canal projects elsewhere in the state likewise extended to nonirrigation purposes. The Bear River Canal was constructed by the Bear Lake and River Water Works and Irrigation Company, whose purpose "was to supply water for domestic, municipal and manufacturing uses ... for irrigation of land and for all other useful and beneficial purposes."[34]

¶ 64 Judicial decisions from the early 1900s also make references to culinary uses of Utah canals. A 1901 decree entered in the Salt Lake County District Court, known as the Morse Decree, granted Salt Lake City and four canal companies "the right to the use of all of the balance of the waters of the Jordan [R]iver for municipal, irrigation, culinary, and domestic purposes, to the extent of the capacity of their several canals."[35] That these canal companies were using the Jordan River for domestic purposes after 1901 is telling, as the Draper Canal drew its water from the Jordan River—the same river at issue in the Morse Decree.[36]

¶ 65 Our decision in *Big Cottonwood Tanner Ditch Co. v. Shurtliff*, 49 Utah 569, 164 P. 856 (1916), provides further evidence of an early twentieth-century understanding of "canal" that encompassed culinary uses. At issue in *Shurtliff* were water rights for "culinary, domestic, and live stock purposes" in the south branch of the Big Cottonwood Tanner Ditch. *Id.* at 864. In describing the background facts, the court noted that "Mr. Hawker ... lived near the ditch in question and obtained his water for culinary and domestic purposes directly therefrom." *Id.* at 858. The *Shurtliff* opinion uses the term

"ditch," but there is little doubt that it used that word as a synonym for canal, and no doubt that the opinion illustrates an understanding of those terms that goes beyond the narrow irrigation-only purpose identified by appellants.

¶ 66 The notion of drinking from a canal would doubtless trouble the modern Utahn's sense of hygiene, but our ancestors apparently would not have had the same reaction. Perhaps their stomachs were cast iron. Or maybe their canal water was less susceptible to contamination. But whatever the reason, it seems clear that our predecessors around 1914 would have seen canals as a source of culinary and domestic water and not just irrigation water.

¶ 67 This history, dating from the 1860s to 1916, confirms that the community living in the Salt Lake Valley in 1914—including the Crosgroves and Judge Armstrong, who wrote the Smith Decree—would have understood that canals were a source of culinary water. Thus, we interpret "canal" as used in the Crosgrove Deeds and the Smith Decree to include water channels that transport water for domestic use. The Water District's aqueduct therefore does not exceed the scope of its rights in Reaches 16, 17, or 19 merely because it transports culinary water.

2

¶ 68 The next issue is whether "canal" is limited to an open water channel or could refer to a pipeline. That depends, again, on the meaning of "canal" as used in the Crosgrove Deeds and the Smith Decree. We conclude that the term "canal," in context, encompasses a closed pipeline.

¶ 69 To begin with, some definitions of "canal" refer specifically to pipes, while others do not.[37] Thus, the word could plausi-

---

**32.** George Thomas, The Development of Institutions Under Irrigation 107 (1920).

**33.** *Id.* at 108–09.

**34.** *Id.* at 208.

**35.** *See Salt Lake City v. Salt Lake City Water & Elec. Power Co.*, 24 Utah 249, 67 P. 672, 680 (1902); LeRoy W. Hooton, Jr., Utah Lake & Jordan River Water Rights & Management Plan 10 (1989), *available at* http://www.slcclassic.com/utilities/pdf%20Files/utah&jordan.pdf.

**36.** Hooton, *supra* note 35, at 14.

**37.** *Compare* Webster, An American Dictionary of the English Language 30 (1st ed. 1828) ("A passage for water; a water course; properly, a long trench or excavation in the earth for conducting

bly have been used in the Crosgrove Deeds and the Smith Decree to refer either to open or closed water channels. That ambiguity requires us to look to the context in which the word was used to determine its scope. Here, the key contextual cue is the common law presumption that parties to an easement anticipate increased future use and reasonable technological improvements.[38] Thus, absent express evidence of contrary intent, there is a firmly established background rule that an easement holder may make technological upgrades to its property, so long as they are not unreasonably burdensome to the servient estate.[39] We have previously discussed this rule in the context of canals and ditches in *Moyle,* 174 P.2d 148, and *Valcarce,* 961 P.2d 305.

¶ 70 In *Moyle,* a prescriptive easement holder sought to cement and waterproof its ditches, and the servient estate owner argued that the scope of the easement was limited to an unimproved, dirt ditch. 174 P.2d at 150. The court held that cementing the ditch was within the scope of the easement, explaining as follows:

> The common law of Utah presumes that ... all parties concerned, knowing of the arid nature of this country, contemplated that at some future time the owner of the water would ... undertake to prevent[ ] wastage of water as the need arose for more efficient use of the limited water available.... If this was contemplated, and the common law of Utah presumes that it was, then ... it was contemplated that the ditch might be improved so as to save the water [and] that these further developments to conserve water could be made by the owner of the easement so long ... as the new developments were reasonably made and did not unnecessarily burden the land.

*Id.* at 152. Our *Valcarce* decision confirmed and applied this same principle. In *Valcarce,* we relied on *Moyle* and upheld a trial court's finding that enclosing an open canal was a reasonable improvement that "enhance[d]

---

water, and confining it to narrow limits; but the term may be applied to other water courses."), *and* ROBERT GORDON LATHAM, A DICTIONARY OF THE ENGLISH LANGUAGE 347 (1882) ("Conduit or narrow passage for the transit of any fluid; artificial channel filled with water for the purpose of inland navigation."), *with* NOAH WEBSTER & CHARLES MORRIS, UNIVERSAL HOME AND SCHOOL DICTIONARY OF THE ENGLISH LANGUAGE 78 (1916) ("an artificial watercourse; a pipe"), *and* 2 OXFORD ENGLISH DICTIONARY 59 (1933) ("A pipe used for conveying water or liquid; also a tube, or tubular cavity. *Obs* .... An artificial water course constructed to unite rivers, lakes, seas, and serve the purposes of inland navigation."), *and* WEBSTER'S NEW INT'L DICTIONARY OF THE ENGLISH LANGUAGE, UNABRIDGED 388 (2d ed. 1958) ("1. A pipe or tube, as for conveying liquids. *Obs.* 2. Any watercourse or channel; specif., a strait; also, a long and narrow ornamental pond. *Obs.* 3. An artificial channel filled with water, designed for navigation, for irrigating land, etc.; as, the Erie *Canal.*").

**38.** We apply the same analysis to the Reach 19 easement and to the Reaches 16–17 restrictive covenant. We see no reason why, at least in this case, the scope of reasonable technological improvements would differ under the easement or the covenants.

**39.** *See Hubble v. Cache Cnty. Drainage Dist. No. 3,* 123 Utah 405, 259 P.2d 893, 896 (1953) ("[T]he law favor[s] changes and improvements for the benefit of the dominant estate so long as

the manifest intent of the parties does not disallow the changes and the burden to the servient tenement is not increased."); *Big Cottonwood Tanner Ditch Co. v. Moyle,* 109 Utah 213, 174 P.2d 148, 160 (1946) ("Plaintiff would not be exceeding its easement in improving its ditches provided the improvements are, under all the circumstances, made in a reasonable manner and they do not cause unnecessary injury to the servient owners."); *see also Parris Props., L.L.C. v. Nichols,* 305 Ga.App. 734, 700 S.E.2d 848, 854 (2010) ("[A] change in the manner, frequency, and intensity of use of the easement within the physical boundaries of the existing easement is permitted without the consent of the other party, so long as the change is not so substantial as to cause unreasonable damage to the servient estate or unreasonably interfere with its enjoyment." (internal quotation marks and emphasis omitted)); RESTATEMENT (THIRD) OF PROPERTY: SERVITUDES § 4.10 (2000) ("The manner, frequency, and intensity of the use may change over time to take advantage of developments in technology and to accommodate normal development of the dominant estate or enterprise benefited by the servitude."); 25 AM.JUR.2D *Easements and Licenses* 84 (2004) ("[I]f the change is not in the kind of use, but merely one of degree imposing no greater burden on the servient estate, the right to use the easement is not affected."); 4 POWELL, *supra* note 15, § 34.12, at 34–142, 34–144 (noting that courts presume that easements may be expanded to permit "technological innovations" so long as the use is "reasonably foreseeable at the time of establishment of the easement").

both the conveyance and the conservation of the water without materially changing the burden or adding any additional burdens" to the subservient estate. 961 P.2d at 313.

¶ 71 Appellants point out that *Valcarce* and *Moyle* were both prescriptive easement cases that contained no language defining the scope of the property right. But we see no significant difference in this respect between prescriptive easement cases, in which there is no conveying document, and this one, in which the Crosgrove Deeds and the Smith Decree speak of canals but are silent as to whether the parties contemplated their future enclosure. Either way there is no express indication as to whether the parties contemplated a potentially enclosed canal or a permanently open one.

■ ¶ 72 Under *Valcarce* and *Moyle*, then, there is a presumption that the parties to a Utah property conveyance for a canal understand and intend that an open canal could eventually be enclosed. Where a deed or decree creates a property right for a canal but is silent as to whether the canal must be open or may be enclosed, the property owner may therefore enclose the canal and install "necessary improved structures" without exceeding the scope of the property right, so long as (1) the improvements are performed reasonably, and (2) they do not materially alter the burden on the servient estate or on the land benefited by a restrictive covenant. *See Valcarce*, 961 P.2d at 312–13.

3

■ ¶ 73 The district court applied the *Valcarce* rule and granted summary judgment, concluding as a matter of law that the enclosure of the canal "is reasonable, given the need for modernization, and does not pose an excessive burden." As we explained in *Moyle*, however, reasonableness and the materiality of a burden are questions for the fact finder. 174 P.2d at 159.[40] The conclusion of reasonableness in *Valcarce* thus cannot directly translate as a matter of law to all cases involving enclosure of a canal. For example, the impact of the PVC-pipe enclosure in *Valcarce* may differ from that of the sixty-inch pipe and cement air valves in this case. Because these are questions of fact, the district court erred in its summary judgment analysis.

¶ 74 Summary judgment is warranted only where there are no genuine issues of material fact. UTAH R. CIV. P. 56(c). And in this context, genuine issues of fact exist if a reasonable mind could conclude that the Water District's improvements were performed unreasonably or that they materially altered the burden on the servient estate.[41] The district court erred in failing to apply this standard. Instead of evaluating whether a reasonable factfinder could rule in plaintiffs' favor, the court stated its own judgment on the matters of reasonableness and materiality.

¶ 75 That error would not require reversal if we could conclude that the same result would obtain even under the correct sum-

40. *See also Valcarce*, 961 P.2d at 313 ("[T]he trial court found that Fitzgeralds piping of the canal was a reasonable improvement, and we defer to that finding of fact.... The trial court found, and we agree, that Fitzgeralds improvement to the ditch enhances both the conveyance and the conservation of the water without materially changing the burden or adding any additional burdens to the Valcarce estate."); *Harvey v. Haights Bench Irrigation Co.*, 7 Utah 2d 58, 318 P.2d 343, 347 (1957) (Worthen, J., plurality opinion) ("What is a reasonable manner for the company to improve a particular ditch is a question of fact to be decided after considering location of the ditch, the type and use of the property through which it flows, the amount of water it carries, the relative cost of the possible methods of waterproofing and all other facts and circumstances bearing on the question." (internal quotation marks omitted)); RESTATEMENT (THIRD) OF PROPERTY

SERVITUDES § 4.10 cmt. c (2000) ("These conflicts frequently present difficult factual issues as to ... whether the proposed change is reasonably necessary, whether it is of the sort that should have been contemplated by the parties, how much damage or interference is likely to ensue, and whether it is reasonable. Resolution of the conflict often demands a detailed inquiry into the particular facts and circumstances of the case, and the issues as to ... reasonableness of use, and extent of damage and interference are usually intertwined.").

41. *See Jackson v. Dabney*, 645 P.2d 613, 615 (Utah 1982) ("A genuine issue of fact exists where, on the basis of the facts in the record, reasonable minds could differ on whether defendant's conduct measures up to the required standard.").

mary judgment standard. Unfortunately, the parties devote little attention to this issue on appeal. The briefs filed in our court focus on the question whether "canal use" encompasses a culinary pipeline, with only passing reference to the questions whether the cement air-valve structures and pipeline were reasonably constructed or whether they materially increase the burden on appellants' property.

¶ 76 Absent any thorough briefing on these questions, we are not in a position to consider affirming on the ground that summary judgment would have been appropriate under a correct legal standard. We therefore reverse and remand for further proceedings on this issue. Though the Water District's property rights in Reaches 16, 17, and 19 are broad enough to include a culinary pipeline, there remain fact-intensive questions that cannot be resolved as a matter of law on the record before us. We accordingly remand for further proceedings on the issues of whether the Water District's enclosure of the canal was reasonable and did not materially alter the burden on appellants' land.

¶ 77 On remand, the district court should evaluate whether a reasonable factfinder could find that the Water District's improvements were performed unreasonably or that they materially altered the burden on the servient estate. In evaluating those questions, the district court should consider (1) the increased impact on appellants' property

resulting from the aqueduct's construction, (2) the "relative costs of the possible methods" of designing and locating the valve structures, and (3) "all other facts and circumstances bearing" on the issue. *Moyle*, 174 P.2d at 159.[42]

### D. Reach 19: Abandonment

¶ 78 In support of the claim that the Draper Irrigation Company[43] abandoned its Reach 19 easement in 1993, appellants assert that Draper Irrigation: (1) ceased transporting irrigation water in the canal, (2) terminated its water rights at the diversion point correlating with that stretch of the canal, (3) discontinued using the pumping station that delivered water to Reach 19 of the canal, and (4) constructed a buried irrigation pipeline through other portions of the canal.[44] The district court granted summary judgment to the Water District on this issue because Draper Irrigation continuously used the canal for storm water drainage, even after the company discontinued using it for irrigation water. We affirm.

¶ 79 Although an easement may be abandoned, such claims are not easily won. A party asserting that an easement has been abandoned must show by clear and convincing evidence that the owner intended to abandon the property right.[45] Moreover, where an easement is created by express grant, mere non-use of the easement is insufficient to demonstrate intent to abandon.[46]

---

42. *See also, e.g., Bd. of Comm'rs v. Ill. Cent. Gulf R.R.*, 379 So.2d 838, 841 (La.Ct.App.1980) (comparing the impact of an easement expansion project with the relative costs of "alternate [construction] method[s]" that would have been less burdensome to the servient estate); *Bodman v. Bodman*, 456 Pa. 412, 321 A.2d 910, 913 (1974) (evaluating the "relative burden to the servient tenement caused by the easement before and after" the easement holder altered its use of the easement).

43. Draper Irrigation Company is ULIC's successor in interest to the easement across Lloyd and Lorraine Cummings' property, created by the Smith Decree, constituting Reach 19 of the canal. In 2001, Draper Irrigation transferred its interest to Draper City, who subsequently granted the interest to Metropolitan Water District for its aqueduct.

44. The appellants similarly argue that Draper Irrigation abandoned its interests in Reaches 16–

17. This claim fails under our holding that the Crosgrove Deeds conveyed fee simple interests to ULIC, Draper Irrigation's predecessor in interest. Our abandonment jurisprudence applies to easements, but not to fee interests in property. *See W. Gateway Storage Co. v. Treseder*, 567 P.2d 181, 182 (Utah 1977) ("It is well recognized that an *easement* or right of way may be abandoned." (emphasis added)).

45. *Id.; Harmon v. Rasmussen*, 13 Utah 2d 422, 375 P.2d 762, 766 (1962) ("Neither filling in around [a] headgate for the purpose of preventing unwanted water being turned into [a] ditch, nor the claim that [a] ditch was not used for several years in succession is clear and convincing proof of [intent to abandon].").

46. *W. Gateway*, 567 P.2d at 182 (explaining that "a right gained by conveyance may not be lost by non-use alone").

There must be additional clear and convincing evidence that the owner intended to make no further use of the property.[47]

¶ 80 As the district court concluded, appellants in this case fail even to show non-use. The canal was continuously used for storm water drainage during the period of alleged abandonment. The relevant time period for the alleged abandonment is between 1993, when irrigation flows ceased, and 1998, when Draper Irrigation recorded at the Salt Lake County Recorder's Office a notice of property interest covering its easement across Reach 19. But beginning in December 1975, Draper Irrigation entered into a series of agreements with Salt Lake County, authorizing the County to use the canal for storm drainage and flood control. These agreements continued in force with respect to Reach 19 until 1999.

¶ 81 Draper Irrigation's authorization to Salt Lake County refutes appellants' argument that Draper Irrigation intended to abandon the easement. Draper Irrigation can hardly be said to have intended to abandon its property interest while simultaneously permitting Salt Lake County's use. Entering into a carefully-crafted contractual agreement demonstrates intent to control access to the property and limit its use to authorized individuals, not to abandon the easement.

¶ 82 Appellants acknowledge that Salt Lake County used Reach 19—with permission from Draper Irrigation—for storm water between 1993 and 1998. Yet they insist that use of the property for storm drainage is not "use of the property for canal purposes," essentially arguing that Draper Irrigation abandoned the easement by using the canal for a purpose other than to transport irrigation water. This argument is flawed. First, the broad notion of "canal purposes" outlined above could easily include storm water drainage. *See supra* ¶¶ 61–67. And even if storm water drainage is ultimately outside the easement's scope, appellants' argument wrongly conflates intent to abandon with misuse of an easement. The claim for exceeding the scope of an easement is not abandonment, but trespass. *Cf. Conatser v. Johnson*, 2008 UT 48, 194 P.3d 897 (defendants charged with criminal trespass for exceeding scope of public easement). Abandonment claims require evidence not of misuse, but of nonuse. Merely showing that the owner's use is possibly beyond the scope of an easement does not show intent to permanently discontinue using the property.

¶ 83 On this record, no reasonable fact finder could conclude that appellants have shown by clear and convincing evidence that Draper Irrigation discontinued using Reach 19 with the intent to permanently abandon its easement. We therefore affirm the district court's grant of summary judgment to Draper Irrigation's successor in interest, the Water District.

### III

¶ 84 For the foregoing reasons, we affirm the district court's conclusions that the Crosgrove Deeds conveyed fee interests in Reaches 16–17 to ULIC, that the Crane Judgment conveyed a fee interest to ULIC in Reach 19, and that Draper Irrigation did not abandon its Reach 19 easement. However, we reverse the district court's conclusion that Reaches 16–17 are not limited by restrictive covenants. We hold instead that the Crosgrove Deeds imposed restrictive covenants that run with the land, limiting Reaches 16–17 to "canal purposes only." We also reverse the district court's conclusion that enclosing the Draper Canal within a buried pipeline was reasonable as a matter of law and so did not exceed the scope of the Water District's property rights in Reach 19. We remand for a factual determination of whether the canal enclosure was reasonable and did not materially alter the burden to appellants' land with respect to Reaches 16, 17, and 19.

47. *Harmon,* 375 P.2d at 766.