**2016 UT App 126**

## THE UTAH COURT OF APPEALS

CLEARWATER FARMS LLC AND
CLEARWATER HOLDINGS LLC,
Appellants,

*v.*

SHANE ROBERT GILES, BRANDI LYNN GILES,
JACOB JAY GILES, AND SHARON VICKIE GILES,
Appellees.

Opinion
No. 20140575-CA
Filed June 16, 2016

Fourth District Court, Provo Department
The Honorable Samuel D. McVey
No. 110400951

Cole S. Cannon, Austin J. Hepworth, Robert C.
Fillerup, Clark B. Fetzer, Gregory M. Simonsen, and
Collin R. Simonsen, Attorneys for Appellants

Leslie W. Slaugh, Attorney for Appellees

JUDGE STEPHEN L. ROTH authored this Opinion, in which JUDGE
KATE A. TOOMEY and JUSTICE JOHN A. PEARCE concurred.[1]

ROTH, Judge:

¶1    Plaintiffs Clearwater Farms LLC and Clearwater
Holdings LLC (collectively, Clearwater) appeal the district
court's ruling in favor of Shane Robert Giles and Brandi Lynn

---

1. Justice John A. Pearce began his work on this case as a
member of the Utah Court of Appeals. He became a member of
the Utah Supreme Court thereafter and completed his work on
the case sitting by special assignment as authorized by law. *See
generally* Utah R. Jud. Admin. 3-108(3).

Giles, individually and as co-trustees of the Shane Robert Giles and Brandi Lynn Giles Family Trust; and Jacob Jay Giles and Sharon Vickie Giles, individually and as co-trustees of the Giles Family Trust (collectively, the Gileses). We conclude that the district court did not err when it considered only historical use to determine a road's width. We also conclude that the court did not err when it ruled that the Gileses did not obstruct or interfere with Clearwater's water rights. Accordingly, we affirm.

## BACKGROUND[2]

¶2     Clearwater and the Gileses own adjacent parcels of land near Lake Shore in an unincorporated area of Utah County. A farm lane (the Road), which has been in existence since at least the early twentieth century, runs from south to north and crosses the Gileses' land, paralleling the course of the Spanish Fork River, before turning west and terminating in a dead end on Clearwater's property. In 1996, the Gileses purchased the farmland. Approximately two years later, another individual named Morley, Clearwater's predecessor, purchased a twenty-one-acre parcel of land directly to the north. The following year the Gileses subdivided their land to create two building lots and built a house on each. In connection with the subdivision approval, Utah County required the Gileses to improve a segment of the Road leading to the northernmost lot and to dedicate that segment to the county with a fifty-six-foot wide right-of-way. This dedication left a three-hundred-foot long section of the Road solely on the Gileses' property in its original

---

2. "On appeal from a bench trial, we view the evidence in a light most favorable to the trial court's findings, and therefore recite the facts consistent with that standard." *Johnson v. Higley*, 1999 UT App 278, ¶ 2, 989 P.2d 61 (citation and internal quotation marks omitted).

condition, essentially unimproved and with the smaller historical right-of-way footprint.

¶3     At one time, an irrigation ditch (the Morley ditch) ran along the west side of the unimproved section of the Road. Prior to the Gileses' purchase of their farmland, this ditch provided irrigation water to the Morley property, but due to flooding of the Spanish Fork River and a subsequent rise in the farmland's elevation from silt deposits, irrigation of the Morley property from the ditch became impossible. The Gileses agreed to allow Morley to build a pump house next to side of the Road, complete with an electric pump attached to a six-inch pipe, thereby allowing Morley to irrigate his property. Morley buried the six-inch pipe in the irrigation ditch, leaving only a swale to identify the location. Morley used this water delivery system until approximately 2003 when he decided that the cost of electricity to run the pump made it impracticable to continue. In 2009, Morley cut the six-inch pipe, left it in the ditch, and built a new pump house entirely on his own property with a diesel pump to transport water from a diversion point further north on the Spanish Fork River at a more affordable cost. The following year Clearwater purchased the Morley property and several other parcels of land adjacent to the Gileses' property "to construct a few homes" because, according to Clearwater, the farmland was "ripe for 'subdivision.'"

¶4     The parties' dispute arose in 2011 when Clearwater wanted to remove the six-inch pipe from the Morley ditch and replace it with a forty-two-inch pipe. The Gileses were uncooperative. When Clearwater took preliminary steps to install the larger pipe, the Gileses called local law enforcement to their property. The parties ultimately came to an agreement in April 2012 that provided Clearwater with an easement across the Gileses' property for utilities and water. But Clearwater claimed that, because of the delay in reaching this agreement, it was unable to irrigate for the 2011 growing season. In addition, the dispute over the width of the right-of-way continued between

the parties. Clearwater eventually filed this action in an attempt to establish a fifty-six-foot wide right-of-way on the remaining three-hundred-foot long section of the Road located on the Gileses' property and to seek damages for lost crop revenue that allegedly resulted from the Gileses' interference with, and obstruction of, Clearwater's rights to transport water through the Morley ditch during the 2011 growing season.

¶5    Following a bench trial, the district court rejected Clearwater's claims. The court determined that Clearwater was not entitled to a fifty-six-foot wide right-of-way on the remaining three-hundred foot section of the Road located on the Gileses' property. The court reasoned that the Road had already been dedicated as a public highway through usage over the years (something the parties had stipulated to), thereby requiring the court to look at the "historical use of the road to determine its width" and not its "potential future use" as Clearwater argued. The court found that the width "reasonable and necessary for a farm lane" to ensure safe travel was thirty feet.[3] The court also concluded that Clearwater was not entitled to damages for lost crop revenue, because the Gileses had not obstructed Clearwater's water rights. Clearwater timely appealed.

ISSUES AND STANDARDS OF REVIEW

¶6    Clearwater raises two issues on appeal, both involving questions of statutory interpretation. First, Clearwater asserts that the district court erred when it found that the Road was

_____

3. The district court described the thirty-foot width as "26 feet for the traveled surface and a two foot graded shoulder on either side." The Gileses stipulated that the width of the Road "may consist of 26 feet of pavement with side grades of two feet, or not more than 30 feet."

limited to a width of thirty feet, because the court "expressly refused to consider any factors other than historical use" after the parties agreed that the Road was a public highway. Clearwater argues that the phrase "facts and circumstances" as used in section 72-5-104 of the Utah Code includes "future use of a public right-of-way." We review for correctness the district court's decision regarding whether the statute required the court to consider historical use "but grant the court significant discretion in its application of the law to the facts." *See Haynes Land & Livestock Co. v. Jacob Family Chalk Creek, LLC*, 2010 UT App 112, ¶ 7, 233 P.3d 529 (citing *Utah County v. Butler*, 2008 UT 12, ¶ 9, 179 P.3d 775). "Additionally, we review the district court's factual findings only for clear error." *Id.* ¶ 7 (citing *Wasatch County v. Okelberry*, 2008 UT 10, ¶ 8, 179 P.3d 768).

¶7 Clearwater next asserts that the district court erred by not awarding damages for lost crops due to the Gileses' obstruction, or alternatively, due to their interference with Clearwater's water rights under Utah Code sections 73-1-7 or 73-1-15. "The proper interpretation and application of a statute is a question of law which we review for correctness, affording no deference to the district court's legal conclusion[s]." *Id.* ¶ 9 (alteration in original) (citation and internal quotation marks omitted).

ANALYSIS

¶8 Clearwater describes the "main premise" of its argument with regard to both issues as follows: "[E]asements can, and should be expanded to meet the needs of the dominant estate's reasonable and necessary use of the easements." Clearwater "maintains that the court erred in not allowing the reasonable expansion and alteration of [the] existing easements" for road access and water delivery over the Gileses' property. We first address Clearwater's arguments regarding the width of the public right-of-way. We then consider Clearwater's claim for damages due to lost crops.

## I. Width of the Road

¶9     The district court found that, prior to trial, the parties had stipulated that the Road "has been continuously used by the public for a period of at least ten years and therefore [the Road] is a public right-of-way held by the State of Utah in accordance with section 72-5-104 [of the Utah Code]," but it also found that the parties had not agreed on the width of the Road. The court then determined that, "[o]nce a road has been dedicated by public use, the Court must look to the historical use of the road to determine its width" and concluded that, based on historic use, "the width of the 300 foot section at 30 feet . . . is more than reasonable and necessary for a farm lane for two passing vehicles with the limited traditional uses" found in rural, less-developed areas. Clearwater argues on appeal that the district court erred in determining the width of the Road by "expressly refus[ing] to consider any factors other than historical use." According to Clearwater, section 72-5-104(9) of the Utah Code states that a court should consider "that which is *reasonable and necessary* to ensure safe travel *according to the facts and circumstances*," which include "potential future use," "current situations," and "future uses of the dominant estate, of the public, and of the easement." (Emphases in original.)

¶10     Utah's Rights-of-way Act, Utah Code section 72-5-101 to -406,[4] provides that private property may be dedicated to the public's use. *See* Utah Code Ann. § 72-5-104 (LexisNexis Supp. 2015); *Wasatch County v. Okelberry*, 2008 UT 10, ¶ 9, 179 P.3d 768 (stating that the Rights-of-way Act "allows property to be transferred from private to public use without compensation").

---

4. Because the statutory provisions in effect at the relevant times do not differ materially from the statutory provisions now in effect, we cite the current version of the Utah Code Annotated for convenience, except where otherwise noted.

The Act provides that "[a] highway[5] is dedicated and abandoned to the use of the public when it has been continuously used as a public thoroughfare for a period of 10 years." Utah Code Ann. § 72-5-104(2)(a). "The requirement of continuous use . . . is satisfied if the use is as frequent as the public finds convenient or necessary and may be seasonal or follow some other pattern." *Id.* § 72-5-104(3); *see also Okelberry*, 2008 UT 10, ¶ 14 (interpreting the meaning of "continuously" in the Rights-of-way Act as "without interruption" (citation and internal quotation marks omitted)). "The scope of the right-of-way is that which is reasonable and necessary to ensure safe travel according to the facts and circumstances." Utah Code Ann. § 72-5-104(9); *see also Memmott v. Anderson*, 642 P.2d 750, 754 (Utah 1982) ("Generally, the width of a public road is determined according to what is reasonable and necessary under all the facts and circumstances." (citation omitted)).

¶11 According to Clearwater, the "facts and circumstances" mentioned in this section "are not limited . . . to just historical facts and circumstances"; rather, this language is "meant to be all inclusive [and] to consider current situations and future uses." Clearwater asserts that the court erred by "look[ing] only to historical uses of the Road" and by "refusing to evaluate future uses and the [right-of-way width] requirements imposed by the County," which Clearwater considers necessary "to enjoy the reasonable use of [its] propert[y]." According to Clearwater, the

---

5. "'Highway' means any public road, street, alley, lane, court, place, viaduct, tunnel, culvert, bridge, or structure laid out or erected for public use, or dedicated or abandoned to the public, or made public in an action for the partition of real property, including the entire area within the right-of-way." Utah Code Ann. § 72-1-102(7) (LexisNexis 2009). There appears to be no dispute that the Road, though a farm lane, is a "highway" under the statute.

Road easement should be "adaptable to the current demands and requirements associated with the purpose of the easement." Clearwater asserts that "a court is limited to historical factors only in considering the *type* of use of the easement, and is not limited by historical factors in establishing the breadth or width of the easement necessary to accommodate that same *type* of use today and in the future." (Emphases in original.) Clearwater also contends that under "current [county] regulations, it is necessary to have an access road of fifty-six feet" and that "it is reasonable, necessary, and proper to have the three hundred foot section match the existing roadway" on the Gileses' property. We disagree.

A.     The County Ordinance Did Not Require a Fifty-Six-Foot Right-of-way.

¶12     Utah Code section 72-5-104(8) provides that the right-of-way is "held by the state in accordance with Sections 72-3-102 [class A roads], 72-3-104 [class C roads], 72-3-105 [class D roads], and 72-5-103 [title to property acquired by the Rights-of-way Act]." Utah Code Ann. § 72-5-104(8). The Road at issue here is a class D road. *See id.* § 72-3-105 (2009) (defining a "class D road" as "any road, way, or other land surface route that has been or is established by use . . . and has been maintained to provide for usage by the public for vehicles with four or more wheels that is not a class A . . . or class C road"); *cf. id.* § 72-3-102(2) ("State highways are class A roads."); *id.* § 72-3-104(2) ("City streets are class C roads."). Because the Road accommodates four-wheeled vehicles, which is a basic requirement of class D roads, and does not meet the definition of either a class A state highway or a class C city street, the Road falls into the category of class D roads under section 72-3-105(1) of the Utah Code. Accordingly, "[t]he county governing body exercises sole jurisdiction and control" over the Road. *Id.* § 72-3-105(4). Clearwater argues that, as a consequence, the Utah County ordinances must govern the Road's width. Utah County Code section 17-6-1-2(b) defines "Right-of-way" as "the width of the road set aside for travel and

road purposes, including the travel way, shoulders, borrow pit, curbs, gutters, sidewalks, safety islands, walk offsets and planter strips." The subsection that follows defines "Standard rights-of-way" as "the road rights-of-way which are wide enough to meet minimum Utah County standards, *including* local roads, fifty-six (56) feet; collector roads, sixty-six (66) feet; arterial roads, eighty (80) and one hundred (100) feet." Utah County Code § 17-6-1-2(c) (2011) (emphasis added). But the county ordinances provide no definition of "local roads" or any indication that the categories of roads actually listed in the ordinance include every possible road right-of-way. *Cf.* Utah Code Ann. § 68-3-12(1)(f) (LexisNexis 2014) (providing that the words "'[i]nclude,' 'includes,' or 'including' mean[] that the terms listed are *not* an exclusive list, unless the word 'only' or similar language is used to expressly indicate that the list is an exclusive list" (emphasis added)). Thus, the ordinance itself does not definitively establish that the Road at issue here is subject to a specific right-of-way width requirement.

¶13 Further, applicable precedent suggests that it is inappropriate to rely solely on a county ordinance to determine the width of a dedicated right-of-way established by public use. For example, in *Schaer v. State*, 657 P.2d 1337 (Utah 1983), the Utah Supreme Court reversed a district court's grant of summary judgment because "the width of [a] highway [dedicated to the public] presents a question of fact" and the court's reliance on a city ordinance as determinative of the issue "was misplaced." *Id.* at 1342. The *Schaer* court concluded that the city ordinance "merely set[] forth the minimum standards and requirements regarding the widths of streets in a proposed subdivision plan" but that the ordinance "[did] not address the reasonable and necessary width of a highway dedicated to the public." *Id.* Accordingly, on remand the district court was to consider the ordinance "as evidence of what is considered reasonable and necessary under the circumstances" but not controlling as to "what is reasonable and necessary under all the

facts and circumstances." *Id.* (citation and internal quotation marks omitted). Similarly, in *Haynes Land & Livestock Co. v. Jacob Family Chalk Creek, LLC*, 2010 UT App 112, 233 P.3d 529, this court "determine[d] that the district court erred when it deferred or delegated the road width determination to the County." *Id.* ¶ 24. In remanding the issue to the district court, we stated that "if the issue was to be addressed at all, it needed to be determined by the district court according to what is reasonable and necessary under all the facts and circumstances." *Id.* (citation and internal quotation marks omitted). Accordingly, we agree with the district court's interpretation here that section 72-5-104 of the Rights-of-way Act, even considered in light of the county ordinances, does not require the Road to have a fifty-six-foot right-of-way.[6]

---

6. The district court's conclusion also appears to be supported by Clearwater's own witness, a long-time director of the Utah County engineering division responsible for county roads. Clearwater apparently expected its county-employed witness to agree with its assertion at trial (and on appeal) that because the Road is a county road, the county can specify the width of the road and that Utah County Code section 17-6-1-2(b) establishes an absolute minimum road width of fifty-six feet. But the witness stated that there is no "specific width" for "a publically-acquired thoroughfare," and that a county road can, in fact, have "varying widths," including "whatever [the public has] been using" the road for, i.e., a width determined by the public's historic use. Further, the engineering director stated that the width "can be what the road currently is" at the time of dedication—which can be less than fifty-six feet. The district court found that the engineering director's interpretation of the county ordinance was "reasonable," even though the witness interpreted the ordinance "in a different way than Clearwater anticipated."

B.     The District Court Did Not Abuse Its Discretion.

¶14    Because we have concluded that the county ordinance did not require the width of the Road to be fifty-six feet, as Clearwater contends, we now consider whether the district court abused its discretion when it determined the Road's right-of-way to be thirty feet in width. "Utah case law has long established that the determination of the width of a roadway dedicated to the public is to be performed by the district court." *Id.* ¶ 21. "Once the district court has made a determination [of width], it will not be disturbed if [supported] by substantial evidence." *Memmott v. Anderson*, 642 P.2d 750, 754 (Utah 1982).

¶15    There was substantial evidence in this case to support the district court's determination that a thirty-foot right-of-way met the statutory width requirement: "that which is reasonable and necessary to ensure safe travel according to the facts and circumstances." *See* Utah Code Ann. § 72-5-104(9) (LexisNexis Supp. 2015). In arriving at a thirty-foot width for the publicly dedicated road, the district court appropriately considered the evidence before it regarding the Road's history, which included "aerial photographs taken over the years" and "testimony of area residents." The court found that "according to long-time residents," "the historical width of the road varied" but that it "was generally less than 30 feet" and "just wide enough for two vehicles to pass." It also noted that there was "no evidence of accidents or injuries involving the general public on the road." The court further found that because the Road is "bounded by . . . [the Gileses'] fence line and the river bank," "the use of the road was confined and could not go outside the range of 30 feet."

¶16    In making these findings, the court recognized that although "[t]he width is not limited to the actual 'beaten track,'" the width of a publicly dedicated roadway "is determined based on what is reasonable and necessary to accommodate 'the uses which *were made of the road*.'" (Emphasis in original) (quoting

*Jeremy v. Bertagnole*, 116 P.2d 420, 423 (Utah 1941)). It noted that "[t]here is no authority for the Court to take into account potential future use in setting the width." The district court focused on wording from a Utah Supreme Court case upholding the lower court's ruling because the width of the road was based on the "'uses which *were* made of the road'" and what was "reasonable and necessary for the purposes for which the road *was* used." (Emphases added) (quoting *Lindsay Land & Livestock Co. v. Churnos*, 285 P. 646, 649 (Utah 1929)). The district court found that this language "impl[ied] that future use is not considered in determining the width of a road dedicated by public use." And with no evidence from Clearwater that the public right-of-way on the Road was ever fifty-six feet wide, the court "determine[d] the limited use of the road as a farm lane in the past 70 years or so of its history more than justifies the 30 foot width as reasonable and necessary for the public use and safety."

¶17    Clearwater does not dispute that the historical evidence of use supported the court's decision; rather, as noted above, Clearwater contends that the court erred by considering *only* historical use. Clearwater contends that the district court erred in looking to only the historical factors, because "a court is limited to historical factors only in considering the *type* of use of the easement, and is not limited by historical factors in establishing the breadth or width of the easement necessary to accommodate that same *type* of use today and in the future." (Emphases in original.) We disagree.

¶18    The Rights-of-way Act provides that "[t]he scope of the right-of-way is that which is reasonable and necessary to ensure safe travel according to the facts and circumstances." Utah Code Ann. § 72-5-104(9). "In interpreting a statute, our goal is to ascertain the Legislature's intent. We do so by first evaluating the best evidence of legislative intent, namely, the plain language of the statute itself." *Wasatch County v. Okelberry*, 2008 UT 10, ¶ 13, 179 P.3d 768 (citations and internal quotation marks

omitted). And in performing that task, "[w]e give the words of a statute their plain, natural, ordinary, and commonly understood meaning, in the absence of any statutory or well-established technical meaning, unless it is plain from the statute that a different meaning is intended." *Id.* (citation and internal quotation marks omitted).

¶19    Prior cases appear to have interpreted the Rights-of-way Act to focus on "the facts and circumstances" that attended the dedication, i.e., the sort of use that was made of the road during the period that established its status as a public way. In *Lindsay Land & Livestock* the Utah Supreme Court approved the lower court's findings regarding the width of a road dedicated as a public highway. *Id.* at 649. The supreme court concluded that "[u]nder all of the evidence" the lower court had before it— including the testimony of witnesses estimating varying road widths over the years—"the court was justified in fixing the width of the road at one hundred feet." *Id.* The court recognized that "[t]here was evidence that more than this width had been actually used" but it determined that the lower court's decision was "a legitimate conclusion from all of the evidence." *Id.* The court determined that "[i]t was proper and necessary for the court in defining the road to determine its width, and to fix the same according to what was reasonable and necessary, under all the facts and circumstances, for the uses which were made of the road." *Id.* Accordingly, the supreme court concluded that the width of the public highway that the lower court set was properly based on that which was "reasonable and necessary for the purposes for which the road was used," implying that future use is not considered in determining the width of a road dedicated to public use. *See id.*

¶20    Following *Lindsay Land & Livestock*, the Utah Supreme Court again looked to the historical uses of a road dedicated to the public when determining its width. In *Jeremy v. Bertagnole*, 116 P.2d 420 (Utah 1941), the court was asked to consider whether the width of a road dedicated to the public was limited

to the "beaten track," i.e., the "width as has actually been used by [the public]." *Id.* at 423. But the court declined to take such a narrow view and instead considered the "evidence adduced as to the use of the road" as found by the lower court to conclude that "the width . . . is not to be . . . measured by the boundaries of the beaten track" but that "[i]t was proper and necessary for the [lower] court in defining the road to determine its width, and to fix the same according to what was reasonable and necessary, under all the facts and circumstances, for the uses which were made of the road." *Id.* (quoting *Lindsay Land & Livestock*, 285 P. at 649). Thus, although the established footprint of the dedicated road was not controlling, in determining the reasonably necessary width for safe travel, the court looked to how the dedicated roadway had been used by the public. *Jeremy*, 116 P.2d at 423–24.

¶21 Finally, in *Memmott v. Anderson*, 642 P.2d 750 (Utah 1982), the Utah Supreme Court remanded the question of the width of a publicly dedicated highway to the district court for further findings to support its determination that sixteen feet, and not twenty-two feet, was the appropriate width of the easement. *Id.* at 754. In doing so, the *Memmott* court approvingly cited both *Lindsay Land & Livestock* and *Jeremy*. *Id.* ("Generally, the width of a public road is determined according to what is reasonable and necessary under all the facts and circumstances.").

¶22 This court has also applied the principle of looking to the historical uses of a road that has been dedicated to the public when directing a district court to determine its width. In *Haynes Land & Livestock Co. v. Jacob Family Chalk Creek, LLC*, 2010 UT App 112, 233 P.3d 529, we concluded that the district court erred when it determined the width of a public highway by "defer[ring] or delegat[ing]" that responsibility to the county. *Id.* ¶ 24 ("[I]f the issue was to be addressed at all, it needed to be determined by the district court 'according to what is reasonable and necessary under all the facts and circumstances.'" (quoting *Memmott*, 642 P.2d at 754)). We also provided further guidance

to the district court by noting, "Should the district court elect to determine the width of the public portions of the Roadway on remand, it must determine what is reasonable and necessary to ensure safe travel *consistent with the historical uses that resulted in dedication.*" *Id.* ¶ 24 n.8 (emphasis added) (citing *Jeremy*, 116 P.2d at 424) (additional citation and internal quotation marks omitted).

¶23   Based on this case law, it is apparent that the district court's interpretation that the dedication statute provides for a width that is "reasonable and necessary" for safe travel under the circumstances that existed during the period of dedication is supported by the language of the statute itself and by prior precedent. And Clearwater's arguments do not require a different conclusion.

¶24   Clearwater argues that, "Case law consistently holds that the width should be established to be a 'sufficient width for safe and convenient use thereof by such traffic.'" (Quoting *Haynes Land & Livestock*, 2010 UT App 112, ¶ 24 n.8.) Clearwater then asserts that "the thirty feet [width] established by the court allows for a vehicle to access the farm in a crop-only state, but it does not allow for reasonable or convenient use of the farms for all of their normal, typical, and incidental uses as the farms cannot be divided into smaller parcels with a farmhouse on each," relying upon a section of the Utah County Code and testimony from its own witness—a Utah County engineering director—as being determinative of the issue that the Road's minimum width cannot be less than fifty-six feet. But because the district court's determination of the width of the Road was "[supported] by substantial evidence," we decline to disturb its ruling. *See Memmott*, 642 P.2d at 754; *see also Blonquist v. Blonquist*, 516 P.2d 343, 344 (Utah 1973) (determining that "the evidence supports the findings of the court" that the forty-four foot width of the roadway dedicated by public use was "reasonably safe and convenient for the use to which the road was put"); *Lindsay Land & Livestock v. Churnos*, 285 P. 646, 649

(Utah 1929) (approving the district court's conclusion that "from all of the evidence" a width of one hundred feet "was reasonable and necessary for the purposes for which the road was used").

¶25     Further, Clearwater has not persuaded us that the cases it cites require a different conclusion. Clearwater argues on appeal that "easements can, and should be expanded to meet the needs of the dominant estate's reasonable and necessary use of the easements" and that "[c]ase law recognizes that it is appropriate and proper to allow such use of an easement as is reasonably necessary to make use of and enjoy the dominant estate, provided that it does not unduly burden the servient estate." Clearwater then asserts, "Utah case law is full of examples of easements not being set in stone, but being adaptable to the current demands and requirements associated with the purpose of the easement." In so arguing, Clearwater cites *Stern v. Metropolitan Water District of Salt Lake & Sandy*, 2012 UT 16, 274 P.3d 935. But the *Stern* court stated, "Here, the key contextual cue is the common law presumption that parties to an easement anticipate increased future use and reasonable technological improvements." *Id.* ¶ 69. In support of its ruling, the *Stern* court cited two private prescriptive easement cases—and no case involving a public right-of-way acquired through public use. *Id.* And this principle of expansion that Clearwater argues on appeal seems to have emerged from the realm of private prescriptive easements rather than easements arising from public use. Private prescriptive easements have at their core the concept that there is one property that is benefited by the easement—the dominant estate—and another burdened by it— the servient estate. *See* 25A Am. Jur. 2d *Easements and Licenses* § 1 (2016) ("When an easement is for the benefit of another property, such as an easement to provide access to an adjacent property, the neighboring property is known as the 'dominant estate' while the property subject to the easement is known as the 'servient estate.'" (footnote omitted)); Thompson on Real Property § 60.02(f)(3) (2006) ("The property for the benefit of

which the easement is imposed is called the dominant tenement. . . . The property upon which the easement is imposed is called the servient tenement." (footnote omitted)). Thus, it is natural to consider the reasonably foreseeable changes that may occur in "[t]he manner, frequency, and intensity of the use" that may be necessary "to accommodate normal development of the dominant estate . . . benefited by the servitude." Restatement (Third) Property: Servitudes § 4.10 (Am. Law Inst. 2000).

¶26　In contrast, there is no dominant estate associated with a public right-of-way: "In every instance of a private easement, that is, an easement not enjoyed by the public, there exists the characteristic feature of two distinct tenements, one dominant and the other servient; public easements on the other hand are in gross, and in this class of easements there is no dominant tenement." 28A C.J.S. *Easements* § 11 (2008) (footnote omitted); *see also* 25A Am. Jur. 2d *Easements and Licenses* § 6 (2016) ("A right of way may be public or private. The use rights of a public right of way are vested equally in each and every member of the public while a private right of way relates to that class of easements in which a particular person . . . , as distinguished from the general public, has an interest or right." (footnotes omitted)). And the type of easement at issue here is one acquired by *public* use for the benefit of the traveling public; it is not a private easement, whether prescriptive or otherwise. Thus, the fact that Clearwater may benefit from the Road is incidental to the Road's public nature and does not give Clearwater an interest different from any other member of the public or afford Clearwater's property the status of a dominant estate whose own potential for expansion can *ipso facto* dictate an expanded role for the public's right-of-way.

¶27　In addition, though it is conceivable that the use of a public right-of-way may increase in intensity as time goes on, Clearwater has not established that even in the case of a private easement, "'a change in the manner, frequency, and intensity of use'" could extend beyond "'the physical boundaries of the

existing easement.'" *See Stern*, 2012 UT 16, ¶ 69 n.39 (quoting *Parris Props., LLC v. Nichols*, 700 S.E.2d 848, 854 (Ga. Ct. App. 2010)) ("[A] change in the manner, frequency, and intensity of use of the easement *within the physical boundaries of the existing easement* is permitted without the consent of the other party, so long as the change is not so substantial as to cause unreasonable damage to the servient estate or unreasonably interfere with its enjoyment." (alteration in original)). Consequently, Clearwater has not persuaded us that the district court was wrong to limit the width of the Road, a right-of-way acquired through public use, to thirty feet, the width it determined was reasonable and necessary for safe travel given the circumstances of its acquisition and then-current use, rather than the fifty-six-foot width Clearwater asserted was required to accommodate the potential future uses of its own private property. Accordingly, the district court did not abuse its discretion by setting the Road's width at thirty feet.

## II. Obstruction of the Ditch

¶28    Clearwater next contends that the district court erred in not awarding damages against the Gileses "for obstructing and restricting Clearwater's ability to improve [its] existing water easement." Clearwater asserts that it lost crop revenue because of the Gileses' obstruction and interference, and it brings this claim under two sections of the Utah Code, specifically section 73-1-15, which prohibits obstructing a watercourse, and 73-1-7, which allows for expansion of existing canals and ditches. *See* Utah Code Ann. § 73-1-7 (LexisNexis 2009); *id.* § 73-1-15 (2012). Clearwater asserts that section 73-1-7 "creat[es] its own cause of action," which is "independent" of section 73-1-15. Clearwater has not persuaded us that the district court erred.

¶29    Clearwater's damages claim is largely based on the following series of events. Clearwater approached the Gileses about installing a forty-two-inch pipe in place of the six-inch pipe in the Morley ditch. The Gileses objected. The parties

attempted to resolve the issue, but eventually the Gileses informed Clearwater that there "would [be] no cooperation" on their part. Regardless, Clearwater decided to move forward with installation of the forty-two-inch pipe. Clearwater arranged for a gas company contractor to perform a gas line probe before digging to install the larger pipe. The contractor parked a track hoe in front of the abandoned pump house near the Road, but the Gileses mistakenly believed Clearwater owned the track hoe and that it was there for the purpose of installing the larger pipe in the Morley ditch. The Gileses called the sheriff—who previously had told them that contacting the authorities was the safest path to take if there was a conflict. After arriving at the location, the sheriff stated that, in his opinion, the larger pipe should not be installed until the matter was resolved. At that time, based on the sheriff's suggestion, the Gileses placed "no trespassing" signs on the pump house and told Clearwater not to enter the pump house or make any improvements to the water delivery system. In response, Clearwater petitioned for a temporary restraining order to allow it to proceed with the pipe installation. But Clearwater did not move the restraining order petition forward to resolution, because, according to Clearwater, the assigned judge was unavailable at the time. (Apparently, Clearwater did not seek another judge to hear the petition.)

¶30    Clearwater argues that the district court erred in rejecting its claim for damages under Utah Code section 73-1-15 on the basis that the Gileses did not cause an interference or obstruction of Clearwater's water rights. Clearwater contends that section 73-1-15 provides that "'watercourse[s] shall be protected against *all* encroachments,' and that 'maintain[ing] in place *any* obstruction' is a violation of the statute." (Alterations and emphases in original) (quoting Utah Code § 73-1-15). Additionally, Clearwater quotes the section's liability provision: "a person who violates this section is 'liable for damages or other relief and costs in a civil action to any person injured by that act.'" (Quoting Utah Code § 73-1-15.) On appeal, Clearwater

frames the issue as "whether the three factors found by the [district] court (no cooperation, calling the Sheriff, and posting 'no trespassing' signs) constitute an 'obstruction' [by the Gileses] under the statute." Clearwater asserts that these three acts qualify as obstructions under the statute and that the district court therefore erred by not "determin[ing] the amount of damages to be awarded to Clearwater for their crops lost in 2011."

¶31    The court found that "Clearwater acknowledged [the Gileses] never physically prevented Clearwater from digging a ditch or installing a pipe" and that the Gileses "only verbally told Clearwater they would resist, would not allow the installation and would not cooperate." The court found that the Gileses' resistance "was turning to the Sheriff—not taking the law into their own hands." After quoting section 73-1-15, the district court concluded, "Simply put, [the Gileses] never placed any physical obstruction or changed the water flow along any ditch. There was no water flowing in a ditch to be interfered with."

¶32    We agree with the district court that the Gileses' actions do not constitute an obstruction under the statute. *See Haynes Land & Livestock Co. v. Jacob Family Chalk Creek, LLC*, 2010 UT App 112, ¶ 9, 233 P.3d 529 ("The proper interpretation and application of a statute is a question of law which we review for correctness, affording no deference to the district court's legal conclusion[s]." (alteration in original) (citation and internal quotation marks omitted)). Section 73-1-15 of the Utah Code states in relevant part,

> Whenever any person has a right-of-way of any established type or title for any canal or other watercourse it shall be unlawful for any person to *place or maintain in place any obstruction, or change of the water flow by fence or otherwise, along or across or in such canal or watercourse*, except as where said

watercourse inflicts damage to private property, without first receiving written permission for the change and providing gates sufficient for the passage of the owner or owners of such canal or watercourse. That the vested rights in the established canals and watercourse shall be protected against all encroachments.

Utah Code Ann. § 73-1-15(1) (LexisNexis 2012) (emphasis added). "Any person violating this section is guilty of a crime," *id.* § 73-1-15(2), and is "also liable for damages or other relief and costs in a civil action to any person injured by that act," *id.* § 73-1-15(3). In *Trujillo v. Jenkins*, 840 P.2d 777 (Utah 1992), the Utah Supreme Court addressed whether the owners of an irrigation ditch would be "subject to criminal liability under [section 73-1-15] . . . if they constructed a fence along [a] ditch." *Id.* at 779. Although *Trujillo* is not factually similar to the instant appeal, the supreme court did shed light on the meaning of this statute:

> Section 73-1-15 prohibits changing the water flow or placing an obstruction along a ditch. Fencing a ditch would not necessarily violate either prohibition. First, placing a fence along a ditch would not change the ditch's water flow. Second, fencing a ditch would not necessarily obstruct the ditch. To obstruct means to block or close up by an obstacle . . . to hinder from passage, action, or operation.

*Id.* (omission in original) (emphasis, citation, and internal quotation marks omitted). The supreme court stated that an obstruction would either "change the ditch's water flow" or "block or close up by an obstacle . . . to hinder from passage." *Id.* (omission in original) (emphasis, citation, and internal quotation marks omitted). Both of these meanings imply the use of some type of a physical barrier that is actually placed in the ditch and that is in contact with the water thereby changing its flow. *See*

*Nicholson v. Holloway Planting Co.*, 216 So. 2d 562, 566 (La. Ct. App. 1968) (describing an "obstacle" as something that would "impede[]" the flow of water in a canal); *Malone v. El Paso County Water Improvement Dist. No. 1*, 20 S.W.2d 815, 820 (Tex. Ct. App. 1929) (concluding that improper canal maintenance had caused an obstruction of the water flow where the canal had become "clogged with weeds, grass and other obstacles which impeded, blocked and retarded the proper flow of water" (internal quotation marks omitted)); *Obstruct*, Black's Law Dictionary (10th ed. 2014) ("To block or stop up (a road, passageway, etc.); to close up or close off, esp. by obstacle.").

¶33   Here, none of the Gileses' actions reach the level of an obstruction under the statute. Regarding the phone call to the sheriff, we cannot see how this action alone would "place or maintain in place any obstruction, or change of the water flow . . . along or across" the ditch. *See* Utah Code Ann. § 73-1-15(1). Further, the Gileses' phone call to the sheriff and his subsequent arrival did not "change the ditch's water flow" or "block or close up by an obstacle . . . to hinder from passage." *See Trujillo*, 840 P.2d at 779 (omission in original) (emphasis, citation, and internal quotation marks omitted). The Gileses merely asserted their belief that Clearwater had no right to expand the size of the pipe in the Morley ditch from six inches to forty-two inches. And although this position was contrary to Clearwater's assertion that it could freely exercise its water rights by expanding the circumference of the pipe, the Gileses' recourse to the sheriff (who simply voiced his opinion that the larger pipe should not be installed until the parties' dispute was resolved), and their installation of no-trespassing signs, may have raised a legal quandary for Clearwater, but those actions do not amount to an obstruction under the statute. In effect, the Gileses' actions seem more like the mere assertion of a contrary legal position. And neither the sheriff's opinion nor the signs "block or stop up" or "close up or close off" the waterway. Nor did they change the waterway's course or impede Clearwater's access to

it. At most, Clearwater was faced with a risk-benefit calculation: whether to move forward and install the forty-two-inch pipe and incur the legal risk that the Gileses might be correct, or keep the six-inch pipe and lose the crops that the larger pipe would have irrigated. And while the Gileses' actions posed a dilemma of some sort for Clearwater, a claim of a contrary legal position does not amount to an obstruction of the kind contemplated by the statute. More than that is required to invoke the statute's criminal and pecuniary remedies. Furthermore, Clearwater had a relatively speedy way to resolve this dilemma through an expedited legal process, which it began through its motion for a temporary restraining order but failed to follow through to resolution.

¶34    Moreover, Clearwater, in its opening brief, has failed to develop beyond simple assertions its arguments regarding the statutory significance of the Gileses' posting of "no trespassing signs" and their lack of cooperation with Clearwater's desire to install the larger pipe.[7] Clearwater has not engaged in the district

---

7. Clearwater's entire argument in its opening brief is that an obstruction under the statute includes the posting of "no trespassing" signs consists of the following: "Clearwater asserts that 'any obstruction' includes the Giles[es'] barring Clearwater from being able to use or expand their water easement by posting 'No Trespassing' signs and utilizing a Sheriff to arrest Clearwater for going against the 'No Trespassing signs.'" And its argument that an obstruction under the statute includes a failure to cooperate is even shorter: "the Giles[es] refused to cooperate with Clearwater or allow the modifications to be made." And, in its reply brief, Clearwater again does not analyze the issue, but simply states, "As articulated in Clearwater's opening brief, . . . these three facts[, i.e., no cooperation from Giles, calling the Sheriff, and posting 'no trespassing' signs,] do constitute an

(continued…)

court's ruling on these issues, let alone shown how the court erred. *See* Utah R. App. P. 24(a)(9).

¶35 Clearwater's contention that the district court erred in interpreting section 73-1-7 of the Utah Code suffers from similar defects and our prior reasoning is equally applicable. Clearwater argues that it had a statutory right to enlarge the existing six-inch pipe and that the Gileses "did not have any right to prevent Clearwater from reasonably expanding or modifying the 'ditch' or pipe." Clearwater contends that "due to the strong public policy in Utah favoring the ability of a party to obtain water, the legislature allowed 'any person' who desired to use or enlarge existing 'canals' or 'ditches' to do so upon proper compensation to the easement holder." (Quoting Utah Code Annotated section 73-1-7 (LexisNexis 2009).)[8] According to Clearwater, as

--------

(…continued)
unlawful obstruction. Accordingly, Clearwater should be entitled to damages."

8. When this dispute arose, section 73-1-7 provided,

> When any person desires to convey water for irrigation or any other beneficial purpose and there is a canal or ditch already constructed that can be used or enlarged to convey the required quantity of water, such person shall have the right to use or enlarge such canal or ditch already constructed, by compensating the owner of the canal or ditch to be used or enlarged for the damage caused by such use or enlargement and by paying an equitable proportion of the maintenance of the canal or ditch jointly used or enlarged; provided, that such enlargement shall be made between the 1st day of October and the 1st day of March, or at any other time that may be agreed upon with the owner of such canal or ditch.

(continued…)

an "easement holder" it has "the right to make reasonable upgrades and adjustments," including "a reasonable technological improvement and an effort to reduce waste of water to have irrigation waters flow through an enclosed pipe." The Gileses retort stating that "even if a pipeline is equated with a ditch, the statute only allows expansion of 'the ditch,' not construction of a new ditch."[9] The district court found that there was "clearly no canal," because the six-inch pipe had been buried. The court then employed a statutory interpretation approach to decide "whether the six-inch pipe was a 'ditch'" under section 73-1-7, thereby allowing for damages for lost crops. The court concluded that "Clearwater does not get the benefit of the statute" because the "plain meaning" of the statute does not equate a pipe with a ditch.

¶36    "When reviewing a decision made on one ground, we have the *discretion* to affirm the judgment on an alternative ground if it is apparent in the record." *Madsen v. Washington Mutual Bank*, 2008 UT 69, ¶ 26, 199 P.3d 898 (emphasis in original); *see also Bailey v. Bayles*, 2002 UT 58, ¶ 10, 52 P.3d 1158

---

(…continued)
Utah Code Ann. § 73-1-7 (LexisNexis 2009). Just after this dispute arose, the Utah Legislature substantially rewrote this section. *See id.* § 73-1-7 (2011). We address the version of this statute in effect at the time of the relevant events.

9. The Gileses assert that "Clearwater sought to construct a completely new pipeline in a different location than the existing six-inch line" and that [t]he statute only authorizes enlarging the easement . . . not moving the easement." Clearwater responds that "this point is simply wrong." The district court found that Clearwater's plan was to have the larger pipe "be buried where the old six inch line *was*" and that Clearwater and the Gileses "eventually agreed on this approach" and "it is working well." (Emphasis added.)

("It is well settled that an appellate court may affirm the judgment appealed from if it is sustainable on any legal ground or theory apparent on the record, even though such ground or theory differs from that stated by the trial court to be the basis of its ruling or action, and this is true even though such ground or theory is not urged or argued on appeal . . . , was not raised in the lower court, and was not considered or passed on by the lower court." (citation and internal quotation marks omitted)). Here, the district court determined that the "plain meaning" of the statute's language does not entitle Clearwater to damages, because the statutory language did not extend the plain meaning of the term "ditch" to encompass an enclosed pipe. We agree with the district court that Clearwater is not entitled to damages, but we affirm based on the same reasoning that led the court to a similar conclusion under section 73-1-15: Clearwater has failed to demonstrate that the Gileses actionably impeded its ability to use or enlarge the Morley ditch.

¶37   Clearwater argues that it had the affirmative right to replace the six-inch pipe with a forty-two-inch pipe. But what Clearwater has not done on appeal is demonstrate how the Gileses' actions—refusing to cooperate, calling law enforcement, or posting a 'no trespassing' sign on the pump house—impeded it in some way from exercising "the right to use or enlarge [a] canal or ditch already constructed." As previously discussed, the Gileses merely asserted their belief that Clearwater had no right to expand the existing pipe in the Morley ditch to forty-two inches. Although the Gileses' position was contrary to Clearwater's, the simple assertion of a position that is at odds with Clearwater's did not stop Clearwater from asserting and exercising its rights. Certainly Clearwater could have moved forward and exercised what it believed it had the right to do, i.e., enlarge the six-inch pipe to forty-two inches. But as previously discussed, Clearwater was faced with a risk-benefit calculation. *See supra* ¶ 33. And Clearwater has not persuaded us that the actions taken by the Gileses impeded it from exercising what it

claims to be its right to enlarge the six-inch pipe in the Morley ditch. Therefore, we affirm the district court's ruling.

CONCLUSION

¶38    Because the district court did not err in interpreting the statute and because its determination of the width of the Road was based on substantial evidence, we decline to disturb its ruling. We also affirm the district court's determination that the Gileses did not obstruct Clearwater's water rights or impede its right to enlarge the ditch. Accordingly, we affirm in all respects.

_____